**DRYWALL TAPERS AND POINTERS OF GREATER NEW YORK, LOCAL 1974 OF I.B.P.A.T. AFL–CIO, on its own behalf and on behalf of all persons who are or at any time since March 1, 1978 have been members thereof, and John Alfarone, as President, and Daniel Jones, as Treasurer of Drywall Tapers and Pointers of Greater New York Local 1974 of I.B.P.A.T., AFL–CIO, Plaintiffs–Appellees, Cross–Appellants,**

**v.**

**LOCAL 530 OF OPERATIVE PLASTERERS AND CEMENT MASONS INTERNATIONAL ASSOCIATION, and Michael Canuso as President and Louis D. Moscatiello as Secretary–Treasurer of**

Local 530 of Operative Plasterers and Cement Masons International Association, Defendants,

Local 530 of Operative Plasterers and Cement Masons International Association and Louis D. Moscatiello, Defendants–Appellants, Cross–Appellees,

B–Drywall Finishers and Joseph Ianno, Woodworks Construction Company and Harold Heustein, non-party witnesses herein, non-party Robert E. Goldman and Improved Drywall, Inc., and Robert Vergara, Appellants, Cross–Appellees.

Nos. 1216–1222, Dockets 89–7127, 89–7129, 89–7131, 89–7133, 89–7135, 89–7137 and 89–7161.

United States Court of Appeals, Second Circuit.

Argued Sept. 11, 1989.

Decided Oct. 23, 1989.

Richard Guay, Montclare & Guay, New York City, for defendant-appellant, cross-appellee Louis Moscatiello.

Robert M. Ziskin, Commack, N.Y., for appellants, cross-appellees B–Drywall Finishers and Joseph Ianno.

Robert I. Lesser, McDonough, Marcus, Cohn & Tretter, P.C., New York City, for appellants, cross-appellees Woodworks Const. Co. and Harold Heustein.

Brian E. Maas, Rosenblatt, Maas, Wirfel & Stolz, P.C., New York City, for defendant, cross-appellee Local 530 Operative Plasterers and Cement Masons Intern. Ass'n.

Mark A. Jacoby, Weil, Gotshal and Manges, New York City, for appellants, cross-appellees Improved Drywall and Robert Vergara.

Harvey Stone, Schlam, Stone and Dolan, New York City, for appellant, cross-appellee Robert E. Goldman.

Burton J. Hall, Hall & Sloan, New York City, for plaintiffs-appellees, cross-appellants Drywall Tapers, et al.

Before CARDAMONE, MAHONEY, Circuit Judges, and POLLACK, District Judge.[*]

MILTON POLLACK, Senior District Judge:

### Statement

Nine contemnors—defendant Local 530 and eight non-parties—appeal from a judgment finding them in civil contempt for willful violation of the Court's injunctive orders, and awarding damages and costs to plaintiffs. The contemnors, who are appellants here, are Local 530 itself, its President/Secretary–Treasurer, Louis Moscatiello, its sometime attorney Robert E. Goldman, Esq., and three employers: Improved Drywall and its owner, Robert Vergara; "B–Drywall" and its owner (a sometimes employee of Improved), Joseph Ianno; and Woodworks Construction and its owner, Harold Heustein.

### Background

The contempt proceedings adjudicated below on these appeals are part of an action between Local 1974, a member union of the International Brotherhood of Painters and Affiliated Trades, and Local 530, a member union of the Operative Plasterers and Cement Masons International. The underlying action is itself one part of an historical rivalry between these two construction trades over the representation of workers engaged in the preparation of drywall for painting and wallpapering. Dur-

---

* Honorable Milton Pollack, Senior United States District Judge for the Southern District of New York, sitting by designation.

ing the 1970's, this rivalry was extended to a dispute as to union jurisdiction over a newly developed technique for preparing drywall whereby the entire drywall surface was skim-coated with a diluted solution of the taping and pointing compound. In 1977, the Building Trades Department of the AFL–CIO appointed a National Hearings Panel to determine the allocation of jurisdiction between the two trades. By decision effective March 31, 1978, binding on both trades, the National Hearings Panel awarded jurisdiction as follows:

(1) All pointing and taping, regardless of the material used, is painters' work, provided the drywall surfaces are not to receive plaster, acoustical, or imitation acoustical finishes.

(2) Pointing and taping, regardless of material used, of drywall surfaces which are to receive plaster, acoustical or imitation acoustical finishes shall be the work of plasterers.

(3) The surface produced by the application of the same plaster pointing material as used in the pointing and taping of the joints to the entire drywall surface for the purpose of producing a uniform surface compatible with the pointed and taped joints shall be considered a plaster finish, and the pointing and taping in connection therewith shall be the work of plasterers.

*See Drywall Tapers & Pointers v. Operative Plasterers' and Cement Masons' Int'l Ass'n.*, 601 F.2d 675 (2d Cir.1979) *cert. denied*, 444 U.S. 1073, 100 S.Ct. 1018, 62 L.Ed.2d 755 (1980).

In a local arbitration proceeding before the Building Trades Employers Association, (the body to which resort is required in the first instance), charging that Local 530 was performing work that belonged to Local 1974, an award on June 24, 1980, found that the work belonged to Local 1974 and not to Local 530:

since the material applied is not applied for the purpose of producing a uniform surface compatible with the pointed and taped joints.

However, Local 530 continued to perform work in violation of the arbitration award.

Local 1974 therefore brought this suit to enforce that arbitration decision.

Local 1974 commenced the underlying lawsuit in 1981 seeking a permanent injunction barring Local 530 from violating contracts and arbitration awards by causing its members to perform drywall taping and pointing work, in New York City, that was and had been the work jurisdiction of Local 1974 under such contracts and arbitration awards. After three unsuccessful attempts at obtaining a preliminary injunction, Local 1974 then brought another motion for a preliminary injunction restraining Local 530 from exercising jurisdiction over any sites in New York. The District Court had refused relief pending a reference of the jurisdictional complaints to the Building and Construction Trades Council of Greater New York ("BCTC"), the industry body entrusted with responsibility for resolving such complaints. BCTC made an award in favor of Local 1974.

On January 9, 1984, the District Court issued a preliminary injunction limited to those sites specifically covered by the award. The preliminary injunction ordered:

that defendant Local 530 ... its officers, agents, servants, employees and attorneys, and all persons in active concert or participation with any of them who receive actual notice of this Order ... be and they hereby are enjoined and restrained from asserting jurisdiction over, and from causing or permitting members of such labor union to perform work at, any of the following job sites.... [list of job sites omitted]

The District Court then held an evidentiary hearing on Local 1974's motion for a permanent injunction, and on February 2, 1984, issued a permanent injunction, again limited to those sites covered by the BCTC award and otherwise identical to the language of the preliminary injunction.

Local 530 appealed from the permanent injunctive order on February 9, 1984. By order, without formal opinion, this Court unanimously affirmed the permanent injunction on April 13, 1984.

When the preliminary injunction was entered, drywall work was being performed at 29 affected sites pursuant to collective bargaining agreements between contractors and Local 530. Local 530 then sent a letter to its members and to contractors notifying them of the injunction, advising them that Local 530 would no longer exercise jurisdiction at the sites, and instructing its members to comply with the injunction.

At the time of the injunction, Local 530 had approximately 300 members working at various sites in New York, including the 32 covered by the preliminary injunction. After the permanent injunction was entered, Local 530 contractors continued to assign Local 530 members to worksites and continued to remit dues check-offs and fringe benefit payments to the union's welfare fund. Local 530 continued to collect dues check-offs or fringe benefit payments relating to drywall work at the prohibited sites and acted constructively as a representative of any workers at those sites.

*The Contempt Proceedings*

a) *The First Contempt Motion:*

On February 14, 1984, Local 1974 moved by order to show cause to have Local 530 and four contractors held in contempt for violating the injunctions. Local 530's President, Mr. Moscatiello, was not named as a party to this contempt proceeding. This motion, based on observations made by Local 1974 officials at prohibited sites, alleged that workers known to have been members of Local 530 had been observed working at three of the prohibited sites and that Local 530 was, therefore, still asserting jurisdiction over the sites.

It was represented to the court on the motion that the men supposedly working under the aegis of Local 530 had decided not to remain unemployed and had gone to other unions and were working on those jobs as members of other unions but that Local 530 had nothing to do with past participation in any way whatsoever. The lawyer for Local 530 opened by advising the court that, as to the men observed by Local 1974, "... these men are not working as 530 members."

On those representations, plaintiffs were advised that the Court would not find Local 530 or the employers in contempt on a record that failed to show that the employees had remained members of Local 530. The Court observed that "maybe, [defendants] are playing games here, I don't know whether they are, and if they are, they are going to find it wasn't profitable for them to play games...."

The contempt motion was denied and Local 1974 was directed to conduct further discovery.

b) *The June 1985 Contempt Motion:*

By motion dated June 24, 1985, by which time all of the prohibited jobs were completed, Local 1974 renewed its contempt motion against Local 530 alleging that the latter had retained jurisdiction over the sites through the receipt of payments on behalf of its members. Specifically, it was alleged that Local 530 asserted jurisdiction over the drywall taping work performed on the prohibited job sites; that the employers involved had participated in such violation and had continued to check-off the work dues of those Local 530 members and to pay the work dues over to Local 530; and consequently, that Local 530 had continued to assert jurisdiction over the prohibited job sites.

The evidence for these assertions was obtained through discovery. Work records and remittance forms were obtained both from Local 530 and from contractors, while depositions of both workers and contractors were held. In support of the allegation that Local 530 had continued to assert jurisdiction over the prohibited job sites, Local 1974 alleged that the former had continued to demand payment of such checked-off dues and payment of contribution to its funds.

Appellee's motion alleged acts of contempt as to 16 of the 32 sites and subsequently limited its complaint to the 10 sites for which two particular contractors had been responsible for the drywall work. The matter was then referred to a Magistrate in respect of discovery disputes for report and recommendation. After hear-

ings, at which the only representative parties on whose behalf evidence was presented were Local 1974 and Local 530, the Magistrate reported to the court with the recommendation that Local 530 and various non-parties to the contempt proceeding be found to have willfully violated the injunction because of Local 530's failure to discipline the non-resigning members who had worked at prohibited sites and recommended the imposition of damages. The District Court agreed with the Magistrate's recommendations, except in the matter of the scope of the damages which were revised, holding that the injunction clearly and unambiguously imposed an obligation on Local 530 members to resign from Local 530 before returning to prohibited sites in a non-Local 530 capacity, and further, clearly and unambiguously, establishing an obligation for Local 530 to seek out such non-resigning members and discipline them for having returned to work in a non-Local 530 capacity. The Judge also agreed that the contempt had been willful and upheld the recommendation that the alleged contemnors pay attorneys' fees. Included in the Judge's decision were the contemnors other than Local 530 who were also cast in damages. These others will be dealt with separately later in this opinion.

On its appeal, Local 530 contends that the injunction was not sufficiently specific in terms and failed to describe in reasonable detail the act or acts sought to be restrained. It is contended that the union did not receive the explicit notice of precisely what conduct was outlawed. For example, the injunction did not recite that it required Local 530 members to resign if they wished to return to work at a prohibited site in some capacity other than the Local 530 member. Nor, they say, was notice given to them that they could be held in contempt if they did not affirmatively question the identity and union membership of workers at prohibited sites. Local 530 states that the injunction on its face only barred the union from actively asserting jurisdiction over the sites and from causing or permitting members of Local 530 from working at the sites; and policing both its members and the prohibited sites

to determine if members of Local 530 had returned to the sites in any capacity was not an obligation imposed on the union by the injunction. The District Court held otherwise. We sustain that finding since the conduct and the explanations thereof were properly seen by the District Court as mere subterfuge and unworthy explanations after the Court was misled as to the factual situation on the first contempt proceeding.

### Standards

#### 1. Violation of an Injunction

■ A court may hold a party in civil contempt only if there is a clear and unambiguous order, noncompliance is proved clearly and convincingly, and "the defendant has not been reasonably diligent and energetic in attempting to accomplish what was ordered." *Powell v. Ward*, 643 F.2d 924, 931 (2d Cir.), *cert. denied*, 454 U.S. 832, 102 S.Ct. 131, 70 L.Ed.2d 111 (1981) (citing cases).

#### 2. Due Process

■ Due process requires that before being held in contempt, a party must have notice that it is a defendant in a contempt hearing. Fed.R.Crim.P. 42(b); *Remington Rand Corp.–Del. v. Business Sys., Inc.*, 830 F.2d 1256, 1258 (3d Cir.1987) (applying Rule 42(b) to civil contempt cases); *Dole Fresh Fruit Co. v. United Banana Co.*, 821 F.2d 106, 109 (2d Cir.1987) (same).

■ But where the contempt citation will not result in a fine or imprisonment, formal service is not required. So long as the defendant had actual notice of the contempt proceedings, there is no denial of due process. *United States v. Handler*, 476 F.2d 709, 713 (2d Cir.1973); see also *In re Grand Jury Witness [Arambulo]*, 835 F.2d 437, 441 (2d Cir.1987), *cert. denied sub nom. Arambulo v. United States*, 485 U.S. 1039, 108 S.Ct. 1602, 99 L.Ed.2d 917 (1988) ("... those constitutional due process protections afforded a contemnor facing prison are not perceived to be necessary to the same degree to a civil contemnor not facing that prospect.")

### 3. Local Rule 43(a)

In addition to the normal due process requirements, the lower court has a salutary local rule which states that:

A proceeding to adjudicate a person in civil contempt of court ... shall be commenced by the service of a notice of motion or order to show cause.

Civil Rule 43(a), Rules for the United States District Courts for the Southern and Eastern Districts. This rule is more restrictive in that it requires actual notice by service upon a party's attorney or in the manner provided for by the Federal Rules of Civil Procedure. The Rule further requires that:

The affidavit upon which such notice of motion or order to show cause is based shall set out with particularity the misconduct complained of, the claim, if any, for damages occasioned thereby, and such evidence as to the amount of damages as may be available to the moving party. *Id.*

### 4. Standard of review

The District Court's findings of fact may only be overturned on appeal if they are "clearly erroneous." Fed.R.Civ.P. 52(a); *Ottaviani v. S.U.N.Y.*, 875 F.2d 365, 375 (2d Cir.1989) (court may only reject findings by the trial court when left with the "definite and firm conviction that a mistake has been committed." (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948))).

Where a magistrate has been appointed to conduct an evidentiary hearing, the district court reviews the Report and Recommendation under the same clearly erroneous standard. Fed.R.Civ.P. 53(e)(2); *Wooldridge v. Marlene Indus. Corp.*, 875 F.2d 540, 544 (6th Cir.1989); *Brown v. Wesley's Quaker Maid, Inc.*, 771 F.2d 952, 954 (6th Cir.1985), *cert. denied*, 479 U.S. 830, 107 S.Ct. 116, 93 L.Ed.2d 63 (1986). Then, "[t]he findings of [the magistrate], to the extent that the court adopts them, shall be considered as the findings of the court." Fed.R.Civ.P. 52(a).

### *Violation of the Injunction*

### 1. Local 530

■ Local 530 may only be held in contempt if it violated a clear and unambiguous order that left no doubt in the minds of those to whom it was addressed. *Hess v. New Jersey Transit Rail Operations, Inc.*, 846 F.2d 114, 116 (2d Cir.1988). In determining specificity, the party enjoined must be able to ascertain from the four corners of the order precisely what acts are forbidden. *Sanders v. Air Line Pilots Ass'n, Int'l*, 473 F.2d 244, at 247 (2d Cir. 1972).

■ Local 530's arguments that the injunction was ambiguous as to its requirements, including the requirement to pull all of its members off of the prohibited job sites and to discipline those members who did work at the prohibited jobsites, are unavailing. Local 530 itself based a motion for reargument of the preliminary injunction on the grounds that the injunction would prevent Local 530 members from performing "any work" at the prohibited jobsites. There was also a conscious conspiracy of silence in the union concerning the workers who stayed on the prohibited jobsites so that they would not have to be pulled off. The officers and the members working on the sites did not mention it to Moscatiello, the President, so that he would not have to tell them to stop. Tongue in cheek, "they did not tell him because he did not want to know."

The lack of ambiguity is also evidenced by the fact that one of the contractors, Woodworks Construction, sent a letter to the court complaining that the injunction would cause Woodworks great hardship since it would not be allowed to hire Local 530 laborers.

The proof of noncompliance is clear and convincing. At the same time as Local 530 was making the argument that the injunction would prevent all work by Local 530 members, Local 530 officers and a coterie of the members were working on the prohibited jobsites, obviously in conscious violation of this interpretation of the preliminary injunction. After the issuance of the

permanent injunction, these officers and members nonetheless continued to work on the prohibited jobsites.

The fact that Local 530 officers were working on the jobsites makes clear that Local 530 was not diligent and energetic in attempting to accomplish what was ordered. This also establishes Local 530's "knowing tolerance" of contemptuous actions by its members. *See U.M.W.A. v. Gibbs*, 383 U.S. 715, 739, 86 S.Ct. 1130, 1145–46, 16 L.Ed.2d 218 (1966); *NLRB v. Teamsters, Chauffers, Helpers & Taxicab Drivers, Local 327*, 592 F.2d 921, 928 (6th Cir.1979).

■ Local 530 also contends that a reading of the injunction which would force it to expel or to discipline members would violate the federal labor laws.

The labor "Bill of Rights," 29 U.S.C. § 411, protects union members from being disciplined for exercising their right to speak or to assemble or for joining rival unions. However, § 411(a)(2) provides:

> That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member ... to ... refrain[ ] from conduct that would interfere with [the organization's] performance of its legal or contractual obligations.

Certainly, complying with an injunction is a legal obligation of a union. So it would be appropriate for Local 530 to discipline members who, as a subterfuge, also colorably joined other unions or who worked on a non-union basis at the jobsites. Cf. *Lewis v. AFSCME*, 407 F.2d 1185 (3d Cir.) (the court upholds the expulsion of a member who interfered with the union's obligations under a collective bargaining agreement), *cert. denied*, 396 U.S. 866, 90 S.Ct. 145, 24 L.Ed.2d 120 (1969).

Section 8 of the LMRA, 29 U.S.C. § 158, does not support Local 530's contention that it was prohibited from asking employers to fire Local 530 members who had joined other unions. First, had Local 530 expelled the "rogue" members, this provision would not come into play. It was only because Local 530 did not prevent its members from working on the jobsites that the question of dual union membership arose. Second, the basis for any request to fire would have been membership in Local 530, not membership in another union.

■ Even if Local 530 could reasonably believe (which is implausible) that the injunction only prevented an assertion by Local 530 of jurisdiction at the jobsites, the union unequivocally and consciously violated the injunction:

> (a) Some Local 530 members continued as members in good standing of Local 530, i.e. they were paying dues to Local 530 to insure their union benefits and perquisites, while working at the prohibited sites;
>
> (b) Local 530 collected the checkoff dues and fringe benefit payments directly from the contractors for the Local 530 union members working at the prohibited jobsites;
>
> (c) After the injunction was issued, Local 530 collected 945 hours worth of dues checkoffs and fringe benefits directly from one of the contractors, Woodworks. (Local 530 claims that this was due to Woodworks accounting errors).

Local 530 cannot claim that its due process rights were violated. The union was named in each of the three motions submitted by Local 1974. In his opening remarks, the Magistrate stated, "Judge Nickerson has asked me as one of the magistrates of this Court to undertake a hearing on the plaintiff's motion in this particular case to hold Local 530 in contempt of an Order...."

In addition, Local 530 received a copy of the Report and Recommendation, objected to it and asked for its rejection.

Clearly, Local 530 had actual notice of the contempt proceedings. It also had formal notice by service upon its attorney sufficient for Local Rule 43.

## 2. The Other Contemnors

The district court's order enjoined Local 530 and "all persons in active concert or participation with any of them who receive[d] actual notice of th[e] Order by

personal service or otherwise...." *See* Fed.R.Civ.P. 65(d).

■ Local 530 sent a letter to all of its members and to each of the contractors with whom it had a collective bargaining agreement informing them of the injunction and requesting compliance. Despite this letter, Woodworks Construction, Improved Drywall, B–Drywall Finishers, and their respective principals, hired Local 530 officers and members to work at the prohibited jobsites.

B–Drywall was only set up after the injunction was issued. It was set up by Joseph Ianno, a Local 530 member, to take over some of Improved Drywall's contracts. To facilitate the scam, B–Drywall signed a collective bargaining agreement with a garage attendants union which Local 530 members then joined.[1]

Woodworks manifested its understanding of the injunction in a letter to the court, but then hired Local 530 members and remitted checkoff dues and fringe benefit payments to the union.

Robert Goldman was Local 530's trial counsel at the first contempt hearing. In the course of the hearing, he falsely represented to the court that:

> many of these men have gone to other unions and are working on those jobs as members of other unions ... 530 has nothing to do with past participation with it in any way whatsoever ... we have no relationship to them or anything whatsoever ... 1974 must be fully aware of these facts that these men are not working as 530 members.

Louis Moscatiello, the president of Local 530, later testified that he tried to correct Mr. Goldman on these issues but that Mr. Goldman told him to be quiet.

The contemnors other than Local 530 considered in the second contempt motion challenge the sufficiency, on due process grounds, of the notice of contempt proceedings against them. The record shows that:

(a) each contemnor was aware that Judge Nickerson had designated a magistrate to handle discovery matters, to conduct an evidentiary hearing and to submit a report;

(b) each contemnor received the magistrate's report promptly upon its issuance;

(c) each contemnor submitted objections to the Report and Recommendation of the magistrate;

(d) each of the employer contemnors moved for rejection of the Report and Recommendation, served motions and affidavits and Memoranda of Law with respect thereto;

(e) Local 1974 brought its third contempt motion naming each contemnor and asking that each be adjudged in contempt; the Report and Recommendations was attached to the motion papers; each employer contemnor submitted an affidavit and memorandum of law in opposition, and Moscatiello and Goldman submitted letters in opposition;

(f) none of the contemnors, in their objections, or in their motions to reject or in their opposition to Local 1974's third contempt motion asked for a new evidentiary hearing or for a reopening of the evidentiary hearing;

(g) Judge Nickerson approved the Report and Recommendation as modified on December 12, 1986 and by Memorandum and Order of December 15, 1986, he denied Local 1974's third contempt motion "[i]n light of the December 12, 1986 Memorandum and Order";

(h) each contemnor moved for reargument, but this time Goldman asked for an evidentiary hearing which was denied.

The contractors had actual, if not formal, notice of the proceedings before the magistrate and the Judge, of their nature and substance, and of the place and date where they would be heard. Mr. Goldman had actual notice of the proceedings before the Judge.

Louis Moscatiello also received constructive notice of the contempt hearing through his positions as President and Secretary–Treasurer of Local 530. But the notice to

---

1. At the request of its international union, the garage attendants union, Teamsters Local 272, eventually withdrew from representing any workers at the prohibited jobsites.

Local 530 does not rise to level of formal notice for Louis Moscatiello. *Dole Fresh Fruit Co.*, 821 F.2d at 110 (notice to the corporation that it is a defendant in a contempt hearing is not sufficient formal notice to its officers); *see also Remington Rand Corp.*, 830 F.2d at 1259 (notice to corporation was not sufficient notice to bankruptcy trustee).

However, constructive notice does not satisfy Local Rule 43(a). Not one of the contemnors, other than Local 530, received the notice to which they were entitled under Rule 43(a). In the absence thereof, an order of contempt against them as non-parties to the proceedings was inappropriate.

### Damages

■ Appellants also challenge the compensatory damages awarded by the district court.

In the Magistrate's original Report and Recommendation, damages were calculated on the theory that if not for Local 530's violation of the injunction, Local 1974 members would have received the employment and should be compensated for all man hours worked on the prohibited sites. The district court rejected this theory and ordered that individual 1974 members would be compensated for the man hours they were unemployed during the period of the contemptuous behavior. Local 1974 was also to be compensated for its lost dues and fringe benefit payments. A ceiling was set based on the number of man hours worked by Local 530 officers and members at the prohibited jobsites.

After extensive discovery had taken place, the Magistrate conducted a careful review of each individual claim and awarded compensatory damages. The Magistrate then adjusted the damages downwards to conform to the ceiling set by the district court.

After receiving objections from both sides, the district judge conducted a *de novo* review and approved the Magistrate's Report and Recommendation with some modifications.

In light of the record and the careful review conducted by the Magistrate and the Judge, we are unable to say that their findings are clearly erroneous.

### Conclusion

The judgment of contempt is upheld as to Local 530. The damages award is also upheld.

The judgment of contempt as to Louis Moscatiello, Robert Goldman, B–Drywall Finishers, Joseph Ianno, Woodworks Construction, Harold Heustein, Improved Drywall, and Robert Vergara is vacated and as to them the matter is remanded to the district court for proceedings in accordance with this opinion and Local Rule 43(a).

MAHONEY, Circuit Judge, concurring in part and dissenting in part:

I concur in the result as to defendant-appellant Louis D. Moscatiello and appellants Robert E. Goldman, B–Drywall Finishers, Joseph Ianno, Woodworks Construction Company, Harold Heustein, Improved Drywall, Inc. and Robert Vergara. It is clear that all persons charged with contempt are entitled to notice that they are defendants in a contempt proceeding, as well as adequate time to prepare a defense, except in the limited circumstances envisioned by Fed.R.Crim.P. 42(a) where instant action is necessary to protect the judicial institution itself. *See Dole Fresh Fruit Co. v. United Banana Co.*, 821 F.2d 106, 110 (2d Cir. 1987), and cases there cited. Since no such notice was provided here, reversal as to the contemnors other than Local 530 would plainly be required, in my view, even in the absence of Rule 43(a) of the Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York, upon which the majority relies.

I am unable to concur, however, in the majority's decision to uphold the finding of contempt against Local 530. The injunction under review prohibited Local 530 from "asserting jurisdiction over, and from causing or permitting [its] members to perform work at," specified jobsites. In response to the injunction, Local 530 terminated its supervisory activities at the affected jobsites, sent letters to its members

advising them of the injunction and asking that it be obeyed, and notified the relevant contractors.

In the affidavit supporting its contempt motion, Local 1974 alleged that Local 530 "not only caused and permitted its members to work on [affected] jobsites but, in addition, asserted jurisdiction" over those sites. The Report and Recommendation of Magistrate Caden, however, stated as Local 1974's sole contention concerning Local 530 that "Local 530 ... caused and permitted members of Local 530 to perform work on certain prohibited jobsites," and aside from two peripheral footnotes, the Report and Recommendation addressed only that issue. In adopting the magistrate's recommendations, furthermore, the district court relied upon and addressed only the "cause or permit" language as the basis of Local 530's violation. The court found Local 530 in contempt for failing to (1) ascertain that certain of its members continued to work at the prohibited jobsites, and (2) discipline or expel those members.

This appeal, therefore, presents us with the question whether the "cause or permit" language of the injunction under review is sufficiently clear and precise as a matter of law to serve as the basis for a contempt adjudication on the facts here presented. For the reasons stated below, I part company with the majority's answer to this question. As a prelude, however, I am moved to address the majority's additional assertion that Local 530 is in any event guilty of "asserting jurisdiction" over the affected jobsites, thereby rendering the contempt ruling sustainable on that alternative theory.

As indicated above, that theory does not underlie the determination we are now reviewing. To be sure, we may consider any argument or theory finding support in the record that serves to sustain a correct district court decision. *See, e.g. Helvering v. Gowran*, 302 U.S. 238, 245, 58 S.Ct. 154, 157–58, 82 L.Ed. 224 (1937); *Alfaro Motors, Inc. v. Ward*, 814 F.2d 883, 887 (2d Cir.1987). We may even raise a "decisive theory" *sua sponte*. *See Arlinghaus v. Ritenour*, 622 F.2d 629, 638 (2d Cir.) (citing

*Cold Metal Process Co. v. McLouth Steel Corp.*, 126 F.2d 185, 189 (6th Cir.1942) (dictum)), *cert. denied*, 449 U.S. 1013, 101 S.Ct. 570, 66 L.Ed.2d 471 (1980). As Judge Friendly said in *Arlinghaus*, however:

> [A]ppellate courts must tread cautiously over terrain that the parties have failed to explore on appeal. Any issue injected into the appeal by the court itself must have been adequately presented below, and the parties must have had a full opportunity to develop the relevant facts. In addition, the appellate court should have the benefit of thorough briefing before considering a decisive issue or rationale.

622 F.2d at 638 (citation omitted).

It seems to me that the considerations outlined by Judge Friendly counsel us to refrain from adopting the "asserting jurisdiction" theory in the present circumstances. First, we obviously lack the guidance of briefing or argument with respect to it. Second, the points advanced by the majority in support of the theory do not present a strong argument for its adoption. These points are as follows:

> (a) Some Local 530 members continued as members in good standing of Local 530, i.e. they were paying dues to Local 530 to insure their union benefits and perquisites, while working at the prohibited sites;
>
> (b) Local 530 collected the checkoff dues and fringe benefit payments directly from the contractors for the Local 530 union members working at the prohibited jobsites;
>
> (c) After the injunction was issued, Local 530 collected 945 hours worth of dues checkoffs and fringe benefit payments directly from one of the contractors, Woodworks. (Local 530 claims that this was due to Woodworks accounting errors).

Point (a), I believe, speaks to the "cause or permit" issue, not to the question whether jurisdiction was asserted by the union. Point (b), as far as I can tell, is referring to the same situation as point (c), but in much more general terms. The record before us does not warrant any such generalization.

Point (c) itself is certainly a correct statement, but whether those 945 hours—out of a total of 110,159.4—justify a finding of contempt on the "asserting jurisdiction" theory or, on the contrary, illustrate substantial compliance with the injunctive order should not, I suggest, be determined by us *sua sponte* at this stage, especially in the context of (1) an assertion by Local 530 that the collection resulted from an accounting error by a third party, and (2) the absence of any consideration of, or findings of fact concerning, this issue by the magistrate or the district court.

I now turn to the heart of my disagreement with the majority. While I accept the premise that it was within the district court's authority to require Local 530 to take the dual steps of policing the jobsites and disciplining errant members found thereat, I do not share the view that these steps were actually required by the injunction under review with the clarity and precision necessary to sustain the finding of contempt and resulting $542,863.37 damage award.

A finding of contempt for violating an injunction is proper only if (1) the order is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the defendant has not been reasonably diligent and energetic in attempting to accomplish what was ordered. *Powell v. Ward*, 643 F.2d 924, 931 (2d Cir.) (per curiam), *cert. denied*, 454 U.S. 832, 102 S.Ct. 131, 70 L.Ed.2d 111 (1981). *See, e.g., Hess v. New Jersey Transit Rail Operations, Inc.*, 846 F.2d 114, 116 (2d Cir.1988) ("No one may be held in contempt for violating a court order unless the order is clear and specific and leaves no uncertainty in the minds of those to whom it is addressed.") (citing *International Longshoremen's Ass'n v. Philadelphia Marine Trade Ass'n*, 389 U.S. 64, 76, 88 S.Ct. 201, 208, 19 L.Ed.2d 236 (1967), and *Powell v. Ward*, 643 F.2d at 931); *Sanders v. Air Line Pilots Ass'n, Int'l*, 473 F.2d 244, 247 (2d Cir.1972) (normal standard of specificity is that party enjoined must be able to ascertain from four corners of order precisely what acts are forbidden). Furthermore, "[t]he longstanding, salutary rule in con-

tempt cases is that ambiguities and omissions in orders redound to the benefit of the person charged with contempt." *Ford v. Kammerer*, 450 F.2d 279, 280 (3d Cir. 1971).

The first element of the *Powell* rule, requiring that an injunction be "clear and unambiguous," builds upon the requirements of Fed.R.Civ.P. 65(d) that an injunction "be specific in terms" and "shall describe in reasonable detail ... the act or acts sought to be restrained." In my judgment, this element has not been satisfied.

Local 530 clearly took actions calculated to comply with the plainly stated command of the district court, *i.e.*, to withdraw from the affected jobsites. While it is true that the union had originally opposed the injunction on the ground that it would enjoin members of Local 530 from performing "any work" at the jobsites, this does not establish that Local 530 understood the injunction to forbid its members from working on those jobsites in a non-Local 530 capacity, much less as requiring Local 530 to police those sites and take disciplinary action against offending workers. It is not clear, furthermore, that such actions were contemplated by the spirit and purpose of the injunction, the primary objective of which was to ensure removal of Local 530 from jurisdictional authority over the affected sites. This is far from a toothless remedy; indeed, Local 530 experienced immediate and obvious financial reverses as a result of this removal.

"The judicial contempt power is a potent weapon. When it is founded upon a decree too vague to be understood, it can be a deadly one. Congress responded to that danger by requiring that a federal court frame its orders so that those who must obey them will know what the court intends to require and what it means to forbid." *International Longshoremen's Ass'n v. Philadelphia Marine Trade Ass'n*, 389 U.S. 64, 76, 88 S.Ct. 201, 208, 19 L.Ed.2d 236 (1967). In this case, Local 530 has been found guilty of failing to take steps which the district court injunction did not require with precision and clarity. I therefore respectfully dissent from the de-

cision to uphold the finding of contempt against Local 530.