## EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff–Appellee,

**Dashiell Nowell Ballard, Fay Chan, Mary Flynn, Hugette Watson, Jerald Diggs, and Certain Other Casuals, Intervenors–Plaintiffs–Appellees,**

v.

**NEW YORK TIMES CO. and New York Newspaper Printing Pressmen's Union No. 2, Defendants–Appellants.**

**Docket Nos. 97–6121, 98–6209, 98–6239.**

United States Court of Appeals, Second Circuit.

Argued: Feb. 9, 1999.

Decided: Sept. 1, 1999.

Order Denying Rehearing Nov. 23, 1999.

Susan L.P. Starr, United States Equal Employment Opportunity Commission (C. Gregory Stewart, General Counsel, Philip B. Sklover, Associate General Counsel, Vincent J. Blackwood, Assistant General Counsel, on the brief), New York, NY, for Plaintiff–Appellee.

Eleanor Jackson Piel, New York, NY (Janice Goodman, Goodman & Zuchlewski, Stephanie B. Davis, on the brief), for Intervenors–Plaintiffs–Appellees.

Bernard M. Plum, Proskauer Rose (Carole O'Blenes, Lloyd B. Chinn, of counsel), New York, NY, for Defendant–Appellant New York Times.

Calvin Siemer, Skadden, Arps, Slate, Meagher & Flom (Michael M. Connery, of counsel), New York, NY, for Defendant–Appellant New York Newspaper Printing Pressmen's Union No. 2.

Before: WINTER, Chief Judge, and VAN GRAAFEILAND and KEARSE, Circuit Judges.

WINTER, Chief Judge:

The New York Times and the New York Newspaper Printing Pressmen's Union No. 2 appeal from two orders issued by Judge Patterson. Both orders found appellants in violation of a 1995 consent decree entered into with the Equal Employment Opportunity Commission (EEOC). The second order also found that appellants had violated the earlier order.

In the consent decree, appellants agreed, *inter alia*, to make a "good faith effort" to achieve a goal of 25% minority and female representation in the Union. Consent Decree ¶ 12(b). The district court found that three subsequent actions had violated the decree. The first order found that a transfer of fifteen Union members to the "Priority List" at the Times from priority lists at other newspapers violated the agreement, and the court ordered the transfer rescinded. In its second order, the court found that the transferees' expanded use of "pre-booking" to "make the transferees *de facto* full-time employees at the Times" violated both the decree and the first order. Finally, the court held that the creation of a seventh shift, which enabled certain Union members, but not Casuals such as the intervenors-appellees, to work an additional shift per week, also violated the decree.

The Union appeals from all three rulings; the Times appeals only from the pre-booking and seven-shift rulings. We hold that the transfer and the restriction of the seventh shift to Union members violated the consent decree but that the transferees' use of pre-booking violated neither the decree nor the earlier order. Accordingly, we affirm in part, reverse in part, and remand for further proceedings.

## BACKGROUND

We first outline employment practices and rules at the Times pressroom under the current Collective Bargaining Agreement (CBA) between the Times and the Union. Top employment priority goes to Journeymen, senior employees who run the newspaper presses. Assisting them are Junior Pressmen. To become a Journeyman, a Junior Pressman ordinarily must work approximately twenty years, averaging five and a half shifts per week. The decision whether to promote to Journeyman is made exclusively by the Union. Both Journeymen and Junior Pressmen are members of the Union.

Two different types of Junior Pressmen have priority to available work in the Times pressrooms: "Times Pressmen" and "Outside Pressmen." The former are regular employees and constitute the Priority List at the Times. They are guaranteed the opportunity to work five shifts per week under the CBA. Outside Pressmen are Union members but not regular employees of the Times. If the number of Times Pressmen available at any time is insufficient to meet the Times's staffing needs, Outside Pressmen are entitled to work in order of seniority by either "pre-booking" or "shaping." Pre-booking is a reservation system that enables Outside Pressmen to fill known vacancies in advance. Shaping allows the Times to hire people from the "shape," a gathering at a Times printing plant of workers hopeful for employment at the start of a shift.

Also entitled to fill in for Times Pressmen (but not Journeymen) are Casuals. Casuals are not members of the Union. They may not pre-book, and Outside Pressmen have priority over them in the shape. By working 110 shifts within either the first or last six months of a calendar year, however, Casuals become eligible to join the Union and receive the attendant benefits of membership.

In 1992, the EEOC filed the present underlying action alleging that the Times and the Union had discriminated against women and minorities in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* According to the complaint, the Union had no black, Asian, or female members and only two Hispan-

ics. Subsequently, various Casuals were allowed to intervene.

On April 5, 1995, the parties agreed to a consent decree approved and entered as an order by Judge Patterson. The decree created an Affirmative Action Program with a goal of 25% minority and female representation on the Casual List and among Junior Pressmen. *See* Consent Decree ¶ 12(a). The decree stated that these goals "are not requirements but objectives to be pursued, to the extent permitted by available work opportunities, in a good faith effort to increase employment opportunities for females and members of minority groups in the Times Co. bargaining unit represented by the Pressmen's Union." *Id.* ¶ 12(b). This provision is at the heart of the instant dispute.

### a) *The Transfer and Judge Patterson's May 8, 1997 Order*

On February 7, 1997, the Times and the Union entered into an agreement extending the CBA, which was originally to expire on March 30, 2000, for an additional five years. As part of the extension, the Times agreed to the transfer, effective on April 1, 1997, of fifteen Outside Pressmen from priority lists at other papers to the Priority List at the Times. This gave the transferees the status of Times Pressmen. Most of the transferees came from the New York Daily News although a few came from the New York Post; none were women or minorities.

On May 8, 1997, Judge Patterson entered an order (the "May 8 Order") directing appellants "to rescind the transfer," stating that "the transfer was inconsistent with the purpose of the Consent Decree." The court further allowed the EEOC to "request additional remedies to correct any inconsistency with the purpose of the Consent Decree that resulted from the transfer."

The Union but not the Times appealed from the May 8 Order. Because the district court had not made any findings or given any reasons for its decision, we re-

manded the case "to make findings and conclusions regarding the validity of the transfer." *EEOC v. New York Times Co.*, No. 97–6121, at 2 (2d Cir. Aug.13, 1998). Pursuant to the procedure outlined in *United States v. Jacobson*, 15 F.3d 19, 21–22 (2d Cir.1994), we stated that jurisdiction would automatically be restored to this court following the district court's decision. *See EEOC*, No. 97–6121, at 3.

### b) *Pre–Booking by the Transferees*

In light of Judge Patterson's May 8 Order, the Times removed the fifteen transferees from its Priority List. The transferees were not, however, restored to the priority lists of their former papers. They continued to work at the Times by reporting to an "out-of-work room" operated by the Union from which they pre-booked for jobs at the Times. Appellants did not inform the EEOC that the transferees were pre-booking. When the transferees pre-booked, they were treated like any other Outside Pressmen, and work assignments were based upon their seniority. Because the transferees were fairly senior employees, they were able almost to double the number of shifts they worked at the Times compared to the number they worked prior to the transfer. While one of the transferees went on non-working disability status and a second went to work at the Post, the remaining thirteen averaged more than four and a half shifts per week at the Times through the end of 1997.

### c) *The Seventh Shift*

By what the district court termed "custom and practice," Junior Pressmen and Journeymen are limited to six shifts per week at the Times. However, in the late fall of 1997, the Times and the Union agreed to allow Journeymen and Junior Pressmen—but not Casuals—to work seven shifts per week between Thanksgiving and Christmas 1997. According to the Times, it agreed to this arrangement because it anticipated a shortage of Journey-

men over the holiday period. Appellants did not inform the EEOC of this decision.

### d) *The August 13, 1998 Order*

The EEOC and Intervenors challenged both the transferees' pre-booking from the out-of-work room and the creation of the seventh shift. On August 13, 1998, the district court found that both actions violated the consent decree and that the pre-booking also violated its May 8 Order. *See EEOC v. New York Times*, No. 92 Civ. 6548(RPP), 1998 WL 474201 at *14 (S.D.N.Y. Aug.13, 1998).

In determining that the transferees' pre-booking violated the decree, the district court found that this practice reduced the opportunity for Casuals to become members of the Union. Although not every shift taken by a transferee would have gone to a Casual, the court found that pre-booking eliminated some work opportunities at the Times that would otherwise have been available to Casuals and thus made it more difficult for the Casuals to work the 110 shifts within a six-month period required for union membership. *See id.* at *4–*8. The district court also found that the out-of-work room was not "typically used as a vehicle for long-term, full-time employment," that the Union made "no effort" to return the transferees to their former employers, and that pre-booking made the transferees "*de facto* full-time employees at the Times." *Id.* at *8, *14. As a result, the district court found a "wilful evasion of the object of the consent decree on the part of the Union," and a violation of the May 8 order. *Id.* at *8. In addition, because the Times was aware of the "purpose and intent" of the decree, acquiesced in the placement of the transferees, never notified the EEOC of the practice, and made no effort to return the transferees to their former positions, the court found that it could not claim to have been a mere innocent bystander. *See id.*

The district court also found that permitting Junior Pressmen to work the seventh shift for several weeks at the end of 1997 adversely impacted the Casuals by reducing the number of shifts they could work and hence diminishing their opportunity for union membership. *See id.* at *11. The court further noted that this new policy was created in a "somewhat secretive" manner, *id.* at *10, and that it "was unnecessary to any legitimate business requirements," *id.* at *13. Although the court recognized a possible justification for allowing Journeymen to work a seventh shift, it found no reason to exclude Casuals from that shift. *See id.* at *10.

The district court ordered the following measures as relief. First, it required the Union to provide both Times and Outside Pressmen, including the transferees, with notice of all work opportunities at the News and the Post, to take steps to arrange pre-booking at the News and the Post, and to find full-time employment for the transferees with one of these papers. Second, it suspended pre-booking for Outside Pressmen at the Times. Third, it required the Times and the Union to provide the EEOC with thirty-days notice of any change in work conditions of Junior Pressmen that might affect the work opportunities of the Casuals. Finally, it ordered the parties to conduct discovery on damages suffered by individual Casuals from the various violations including back pay and entitlement to Junior Pressman status. *See id.* at *14. Both the Times and the Union appealed from this order.

On the same day that Judge Patterson filed the August 13 order, we issued our *Jacobson* remand in the earlier appeal. On November 13, 1998, Judge Patterson adopted his opinion and August 13 order to serve as the findings of fact and conclusions of law for purposes of the remand. With this ruling, jurisdiction was automatically restored to this court, *see Jacobson*, 15 F.3d at 22, and the EEOC moved to consolidate the two appeals. We granted the motion and now affirm in part and reverse in part.

## DISCUSSION

█ We review de novo the district court's interpretation of the consent decree. *See EEOC v. Local 40, Int'l Ass'n of Bridge Structural & Ornamental Iron Workers*, 76 F.3d 76, 80 (2d Cir.1996). Although consent decrees are judicial orders, they are also agreements between parties that "'should be construed basically as contracts.'" *United States v. International Bhd. of Teamsters*, 998 F.2d 1101, 1106 (2d Cir.1993) (quoting *United States v. ITT Continental Baking Co.*, 420 U.S. 223, 236–37, 95 S.Ct. 926, 43 L.Ed.2d 148 (1975)); *see also Crumpton v. Bridgeport Educ. Ass'n*, 993 F.2d 1023, 1028–29 (2d Cir.1993).[1] We read and apply a decree "'within its four corners' and may not look beyond the document to satisfy one of the parties' purposes." *United States v. International Bhd. of Teamsters*, 978 F.2d 68, 73 (2d Cir.1992) (quoting *United States v. Armour & Co.*, 402 U.S. 673, 682, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971)). In addition, "[a] court may not replace the terms of a consent decree with its own, no matter how much of an improvement it would make in effectuating the decree's goals." *Teamsters*, 998 F.2d at 1107. Although courts have equitable powers to enforce consent decrees, such power exists only to ensure compliance with the decrees' terms. *See United States v. Local 359, United Seafood Workers*, 55 F.3d 64, 69 (2d Cir. 1995). Finally, we review the district court's factual findings for clear error. *See EEOC v. Local 580, Int'l Ass'n of Bridge, Structural and Ornamental Iron-workers, Joint Apprentice–Journeyman Educ. Fund*, 925 F.2d 588, 594 (2d Cir. 1991); *Drywall Tapers and Pointers of Greater New York, Local 1974 v. Local 530 of Operative Plasterers and Cement Masons Int'l Ass'n*, 889 F.2d 389, 395 (2d Cir.1989).

█ In the instant case, the validity of the challenged practices turns on provisions of the decree that set out its goals, define appellants' duties in achieving those goals, and limit the efforts required. The decree's general goal is "to correct the statistical imbalance" of minority and female membership in the Union so far as Times' employees are concerned. Decree ¶ 5. It specifically establishes "a goal of twenty-five percent (25%) minority and female representation on the Casual List and a goal of twenty-five percent (25%) minority and female representation among the [Times] Junior Pressmen." *Id.* ¶ 12(a). However, the decree states that a failure to meet these goals will not by itself constitute a violation so long as appellants make a "good faith effort" to achieve them. *Id.* ¶ 12(b).

We note that the Supreme Court has cautioned against non-text-based interpretations of consent decrees derived from amorphous purposes thought to underlie a decree. *See Armour & Co.*, 402 U.S. at 681–82, 91 S.Ct. 1752 ("[T]he decree itself cannot be said to have a purpose; rather the parties have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve."). However, the statistical goals in the instant case are specifically set out in the decree. By focusing on those goals, we are, therefore, enforcing the express agreement of the parties.

We also note that the pursuit of these goals is largely left to appellants' promise to make a good faith effort to achieve them. This obligation is not defined with any specificity in the decree or even in principles of contract law. For example, the Restatement states, "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement," *Restatement (Second) of Contracts* § 205 (1979), "good faith" being defined, *inter alia*, as "faith-

---

1. Although we interpret consent decrees as contracts, critical differences exist between the two instruments. *See, e.g., Benjamin v. Jacobson*, 172 F.3d 144, 156–59 (2d Cir.1999) (in banc).

fulness to an agreed common purpose and consistency with the justified expectations of the other party," *id.* § 205 cmt. a.

In the instant matter, we read the consent decree's requirements as follows. Where employment opportunities arise that might be taken by minorities or women not presently members of the Union but are given to Union members, some justification must be shown by appellants. That justification may be in the nature of discernible industrial or commercial needs, perhaps, for example, to meet exigencies created by some sort of emergency. The justification may also be found in the CBA between the Times and the Union. Reference to the CBA as a justification is somewhat complicated in that a distinction must be drawn between provisions of the CBA in effect when the decree was signed and new provisions added later. This distinction is critical because, when the decree was signed and approved by the court, appellees and the district court were presumptively aware of the not-uncommon provisions of the CBA that give substantial advantages in taking employment opportunities to Union members. We are loathe to say that a generalized good-faith-performance obligation in a consent decree overrides specific pre-existing contractual provisions known to the parties. *See Firefighters Local Union No. 1784 v. Stotts,* 467 U.S. 561, 574–75, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984) (holding that consent decree would not be construed to depart from pre-existing union seniority system without express provision doing so). In the present context, it is precisely the provisions of the CBA giving various substantial priorities to Union members that are the greatest barrier to achievement of the statistical goals and that caused the parties to agree that a failure to meet the numerical goals would not by itself constitute a violation of the decree. Indeed, if the district court may rewrite the CBA at will, the goals can be quickly achieved.

■ Moreover, we believe that where a decree does not invalidate such preexisting contractual provisions, appellants may incorporate such provisions in successive CBA's. Again, appellees and the district court had full notice of such provisions and of the common practice of new CBA's adopting provisions of earlier ones. However, where new provisions of a CBA give advantages to Union members over appellees, they must be justified by legitimate industrial or commercial reasons.

With that background, we turn now to the various actions found to violate the consent decree.

### a) The Transfer

■ As noted, the district court found that the transfer of fifteen Outside Pressmen to the Times Priority List as part of the extension of the CBA violated the decree. *See EEOC,* 1998 WL 474201, at *13. There was not a clear statement by the district court as to the reasons for the invalidity of the transfer before our remand, or even after it. However, we now have an extensive opinion from the court regarding pre-booking by the transferees, and that opinion's reasoning informs us as to the court's thinking regarding the transfer. We agree with the district court that a sufficient justification for the transfer has not been shown by appellants.

The reason for the transfer of fifteen Outside Pressmen to the Times was the relative lack of work opportunities at their original papers compared to the opportunities at the Times. The effect of the transfer was to place the transferees on the Times' Priority List, where they would have the first crack at jobs that might otherwise go to Casuals. Although similar transfers had occurred between New York papers in the past, the Outside Pressmen were not entitled to transfer as a matter of right. It was a discretionary decision whether the work opportunities accorded the transferees as members of the Priority List would go to them at the price of denying some of these opportunities to the Casuals, including Intervenors. The transfer undermined the achieving of the

goals expressed in the decree. We have no doubt that, where the sole consideration in a discretionary decision is whether Union members at other papers or Casuals such as the Intervenors are to get work opportunities at the Times, the good-faith-performance obligation of the decree requires that the jobs go to the Casuals until the 25% goals are achieved. The transfer did, therefore, violate the decree.

b) *Pre–Booking*

■ The district court also found that the extent of pre-booking by the transferees after recission of the transfer also ran afoul of the decree. Pre-booking is, however, quite different from a transfer to the Times' Priority List. Pre-booking is explicitly permitted by the CBA and the consent decree as clarified by a later stipulation. The decree states that

> [a]t the commencement of each shift, to [the] extent that there are Junior Pressman work opportunities available in the pressroom(s) at Times Co. that have not already been filled, Times Co. will offer such opportunities to Junior Pressm[e]n who are members of the Pressman's Union and who are present (in person) at the shape at Times Co. for that shift, in the order provided for in the [CBA] between Times Co. and the Pressmen's Union, (whether such Junior Pressmen are in the Times Co. bargaining unit or the bargaining unit of another newspaper publisher under contract with the Pressmen's Union).

Consent Decree ¶ 15(b). The parties subsequently stipulated that this provision allowed the Times and the Union to use pre-booking to reserve positions in advance. *See EEOC*, 1998 WL 474201, at *1 n. 5. This stipulation thus eliminated the decree's original modification of the CBA that required Outside Pressmen to appear in person at the shape in order to exercise seniority rights.[2]

Therefore, pre-booking cannot by itself constitute a violation of the decree. Nor do we see how the frequency of the use of pre-booking rights can alter the determination of whether the decree has been violated. Rights such as seniority or pre-booking are expected to be exercised as needed, and if the decree had been intended to impose limits on the practice, it should have contained specific provisions in that regard.

■ The district court also relied on an independent ground for finding the transferees' pre-booking to be unlawful; it held that the use of pre-booking in a manner that enabled the transferees to become "*de facto* full-time employees at the Times" constituted a violation of its May 8 Order. Although no contempt sanctions were imposed upon appellants, we review this determination in the same manner as if the court had held appellants in contempt. *Cf. Berger v. Heckler*, 771 F.2d 1556, 1569 n. 19 (2d Cir.1985) ("There is authority for the proposition that where a district court has provided a supplementary remedy to compel compliance without making a finding of contempt, a reviewing court may treat the remedy as if it were a sanction imposed on an order of contempt." (citing *Rodriguez v. Swank*, 496 F.2d 1110, 1111–13 (7th Cir.1974))). Thus, a violation may not be found unless "[i] the order violated

---

2. We do not read the parenthetical language extending seniority rights to employees in "the Times Co. bargaining unit or the bargaining unit of another newspaper ...." to mean that Union members not presently affiliated with a particular paper may not exercise seniority rights under the CBA at the Times. First, the language "whether ... or ...." is most naturally read as an attempt at inclusion, rather than exclusion, and any possible negative implication appears wholly unintentional. Indeed, reading the parenthetical as excluding some Union members is not easily reconcilable with the immediately preceding incorporation of the CBA's seniority provisions. Second, there is nothing in this record suggesting an intent to exclude unaffiliated Union members. Third, the district court gave the possibility of a negative implication no weight whatsoever in its decision. Finally, in approving the consent decree the district court expressly stated that the priority rights of "Union members" under the CBA would not be altered.

... is 'clear and unambiguous,' [ii] the proof of [the violation] is 'clear and convincing,' and [iii] the [violator] was not reasonably diligent in attempting to comply." *United States v. Local 1804–1, Int'l Longshoremen's Ass'n,* 44 F.3d 1091, 1096 (2d Cir.1995) (citations omitted).

The May 8 Order required appellants to "rescind the transfer of fifteen (15) apprentices." In response, appellants removed the fifteen from the Times' Priority List. The EEOC and intervenors argue, however, that the Order required that the fifteen be returned to the priority lists of their prior papers. Although we believe that such an order would have been—and still is—within the court's discretion, the language used does not satisfy the requirement that the order leave "no uncertainty in the minds of those to whom it is addressed." *Hess v. New Jersey Transit Rail Operations, Inc.,* 846 F.2d 114, 116 (2d Cir.1988); *see also King v. Allied Vision, Ltd.,* 65 F.3d 1051, 1058 (2d Cir. 1995); *Drywall Tapers,* 889 F.2d at 395 (violator "must be able to ascertain from the four corners of the order precisely what acts are forbidden"). Merely ordering the recission of a transfer does not in the present context necessarily imply restoration to the priority list of a transferee's prior paper rather than simply rescinding the placing of the transferees on the Times' Priority List. Indeed, as the district court held, it is the pre-booking by the transferees that is the core of the claimed violation of the May 8 order. However, the transferees have the right to pre-book and seniority over the Casuals whether or not the transferees are on the priority list of another paper. *See* Note 3, *infra.* The rub, therefore, is not appellants' failure to restore the transferees to their prior papers but appellees' failure to seek that specific relief apparently as a result of their lack of understanding of the full import of the decree's preservation of the right to pre-book.

Moreover, the EEOC's interpretation was implicitly rejected by the district court in its holding that the May 8 order required only that the transferees not work full-time at the Times. *EEOC,* 1998 WL 474201, at *14. Thus, the district court found that the May 8 Order precluded some, but not all, pre-booking by the transferees; it prohibited pre-booking to a degree that made the transferees "de facto employees." However, the May 8 Order cannot be read as imposing such a requirement. Indeed, so amorphous a command is not appropriate injunctive relief. It gives far too little guidance to appellants as to what level of pre-booking is permitted and would thereby impose on appellants obligations that are essentially determined only after the fact.

### c) *The Seventh Shift*

▮ Appellants challenge the district court's finding that the decision to adopt the temporary seventh shift violated the consent decree. The court held that limiting the employment on the seventh shift to Junior Pressmen—thus excluding Casuals—violated the decree because that exclusion "was unnecessary to any legitimate business requirements." *EEOC,* 1998 WL 474201, at *13; *see also id.* at *10–*11 (discussing evidence). We agree.

Although the seventh shift may have been necessary because of a shortage of Journeymen, the district court found that this legitimate need did not require that only Junior Pressmen be allowed to work that shift. The district court's opinion contains the pertinent factual detail, *see id.* at *10–*11, and it suffices for us to say that its finding is not clearly erroneous. In light of that finding, it appears that the temporary seventh shift gave Junior Pressmen more work at the Times, from which Casuals were excluded for no reason other than to give the work to Union members. For the reasons stated with regard to the transfer, this exclusion violated the good-faith-performance obligation.

### CONCLUSION

We therefore hold that the transfer of the fifteen employees to the Times seniori-

ty list and the exclusion of Casuals from the seventh shift violated the consent decree. We hold that the pre-booking by the transferees did not violate the decree or the May 8 order because that order did not require restoration of the transferees to the priority lists at their former papers. Our holding obviously affects the relief ordered by the district court, and we remand for proceedings consistent with this opinion. We specifically note that the district court should order that any transferee who wishes to exercise pre-booking rights at the Times first be restored to the priority list at his former paper. This will suffice to restore both the transferees and the Casuals to their respective positions prior to the illegal transfer.[3]

## ON PETITION FOR REHEARING BY THE PANEL

### Nov. 23, 1999.

#### PER CURIAM:

The New York Times Co. (the "Times") has petitioned for rehearing to reconsider our decision in *EEOC v. New York Times Co.*, 196 F.3d 72 (*"EEOC II "*). We assume familiarity with, and adopt the defined terms from, our earlier decision.

The Times requests us to correct the statement in our opinion that the seventh shift agreement excluded Casuals and to overturn the district court's holding that the seventh shift agreement thereby violated the Consent Decree. We agree that Casuals were not forbidden to work a seventh shift, and, to that extent, our opinion was in error. However, our ruling that the Times violated the consent decree by temporarily permitting Junior Pressmen

to work seven shifts per week in late 1997 stands. *See EEOC II*, at 76.

The Times is correct that we erroneously stated:

> However, in the fall of 1997, the Times and the Union agreed to allow Journeymen and Junior Pressmen—*but not Casuals*—to work seven shifts per week between Thanksgiving and Christmas 1997.
>
> .    .    .    .    .
>
> Although the court recognized a possible justification for allowing Journeymen to work a seventh shift, *it found no reason to exclude Casuals from that shift.*

*EEOC II*, at 76–77 (emphasis added). The evidence does show that, in fact, when "the Times permitted Pressmen to work a seventh shift, it also permitted Casuals to do so."

Nevertheless, the effect of adding the seventh shift was to deprive Casuals of work opportunities. The district court, after carefully reviewing the evidence, held, and we agree, that allowing both Journeymen and Junior Pressmen to work seven shifts per week during the period between Thanksgiving and Christmas 1997 violated the consent decree by depriving Casuals of the opportunity to work those shifts. *See EEOC v. New York Times Co.*, No. 92 Civ. 6548, 1998 WL 474201, at *9–11 (S.D.N.Y. Aug.13, 1998) (*"EEOC I "*). The business justification for the policy—that there was a legitimate fear that there would be too few Journeymen available—was correctly rejected by the district court on the ground that there was "no evidence that limiting the seventh shift to Journeymen would have been insufficient to meet the Times's staffing needs." *Id.* at *11.

---

**3.** Arguably, doubt exists as to whether Casuals lost opportunities they otherwise might have had as a consequence of the failure to restore the transferees to their former papers. Such doubt stems from the fact that Junior Pressmen on priority lists at other papers still have priority over Casuals for job opportunities at the Times. If some transferees took shifts at the other papers, Union members replaced by them could still exercise seniority

rights as Outside Pressmen at the Times. Judge Patterson found, however, that the failure to restore the transferees did cost the Casuals jobs. In view of our disposition of this matter, we need not review this particular finding, although we note that the Union's destruction of records has left the issue unclear and that its vigorous resistance to restoration suggests that it is not without significance to Union members.

Although we misstated literal facts, our analysis of the issue therefore stands. Indeed, in reaching our decision, we stated that the district "court held that limiting the employment on the seventh shift to Junior Pressman—*thus* excluding Casuals—violated the decree because that exclusion 'was unnecessary to any legitimate business requirements.' We agree." *EEOC II*, at 77 (citing district court's discussion of seventh shift issue) (citation omitted; emphasis added). The fact that Casuals were not specifically excluded from working seventh shifts does not alter the fact that the policy had the effect of excluding them from working additional shifts as explained in detail by the district court. *See EEOC I*, 1998 WL 474201, at *9–11.

The petition for rehearing is therefore denied.