954 F.2d 69
 139 L.R.R.M. (BNA) 2358, 120 Lab.Cas. P 11,092
 DRYWALL TAPERS AND POINTERS OF GREATER NEW YORK, LOCAL 1974
OF I.B.P.A.T., AFL-CIO, on its own behalf and on behalf of
all persons who are or at any time since March 1, 1978 have
been members thereof; John Alfarone, as President and
Daniel Jones, a Treasurer of Drywall Tapers and Pointers of
Greater New York, Local 1974 of I.B.P.A.T., AFL-CIO,
Plaintiffs-Appellees,
v.
LOCAL 530 OF OPERATIVE PLASTERERS AND CEMENT MASONS
INTERNATIONAL ASSOCIATION; Louis D. Moscatiello, as
President of Local 530 of Operative Plasterers and Cement
Masons International Association, Defendants,
Local 530 of Operative Plasterers and Cement Masons
International Association, Defendant-Appellant.
 No. 1490, Docket 91-7153.
 United States Court of Appeals,
Second Circuit.
 Argued May 22, 1991.
Decided Jan. 14, 1992.
 
 Brian E. Maas, New York City (Beldock, Levine & Hoffman, of counsel), for defendant-appellant.
 Burton H. Hall, New York City (Hall & Sloan, of counsel), for plaintiffs-appellees.
 Before KEARSE, MAHONEY and SNEED*, Circuit Judges.
 Defendant-appellant union local appeals from an order of the United States District Court for the Eastern District of New York, Eugene H. Nickerson, Judge, entered December 26, 1990 that preliminarily enjoined the local from causing or permitting its members to perform drywall taping and pointing work in New York City except at job sites where the owner of the site requires that the entire drywall surface be "skimcoat[ed], as a matter of course, ... in order to eliminate shadowing and color or sheen variations."
 Affirmed.
 MAHONEY, Circuit Judge:
 
 
 1
 Defendant-appellant Local 530 of Operative Plasterers and Cement Masons International Association ("Local 530") appeals from an order of the United States District Court for the Eastern District of New York, Eugene H. Nickerson, Judge, entered December 26, 1990 that preliminarily enjoined Local 530 from causing or permitting its members to perform drywall taping and pointing work[1] in New York City except at job sites where the owner of the site requires that the entire drywall surface be "skimcoat[ed], as a matter of course, ... in order to eliminate shadowing and color or sheen variations."
 
 
 2
 We affirm.
 
 Background
 
 3
 In 1981, plaintiffs-appellees, Drywall Tapers and Pointers of Greater New York, Local 1974 of I.B.P.A.T., AFL-CIO, its president and treasurer (collectively "Local 1974"), initiated this action, seeking to enjoin Local 530 from, inter alia, "perform[ing] drywall taping work on surfaces that are not to receive plaster, acoustical or imitation acoustical finishes."
 
 
 4
 The parent international unions of both Local 530 and Local 1974 are member unions of the AFL-CIO, and of its Building and Construction Trades Department (the "Department"). The Department's constitution gives it the power to resolve jurisdictional disputes between member unions and their locals. The Department, by agreement with employer associations, established a "Plan of Settlement of Jurisdictional Disputes in the Construction Industry" (the "National Plan"), which is binding upon all members, and administered by the Joint Administrative Committee (the "JAC"), of the Department.
 
 
 5
 Under the National Plan, jurisdictional disputes are investigated by the "Impartial Jurisdictional Disputes Board" (the "Board"). If, however, a local plan for jurisdictional dispute settlement exists, that plan governs jurisdictional disputes in that locality in the first instance, subject to appeal to the Board. The National Plan further provides that a special Hearings Panel shall be appointed to render a final "national decision which shall be binding on all unions," if: (1) the JAC declares a dispute to be repetitive in nature and the affected national or international unions cannot reach an agreement; (2) a party wishes to appeal a decision of the Board; or (3) the Board refers a dispute for national decision. Such panels are composed of two disinterested union general presidents, two employer representatives, and an impartial umpire selected by the JAC.
 
 
 6
 The pertinent local plan, the New York Plan for the Settlement of Jurisdictional Disputes (the "New York Plan"), was adopted by agreement between the Building and Construction Trades Council of Greater New York (the "Trades Council"), of which both locals are members, and the Building Trades Employers' Association of the City of New York (the "Employers' Association"). The New York Plan calls initially for mediation of jurisdictional disputes by a representative of both the Trades Council and the Employers' Association. If mediation fails to resolve the dispute, it is then subject to arbitration, at the request of any party thereto, by the executive committee of the Employers' Association (the "Executive Committee").
 
 
 7
 The New York Plan also provides that, in resolving jurisdictional disputes, the Executive Committee will recognize "all bonafide decisions and agreements" between international unions, and that the Executive Committee's awards will be published in the Employers' Association handbook, "and shall thereafter govern the awarding of the work of the kind in question on all future jobs." It further specifies that arbitration awards by the Executive Committee can be appealed to the Board, in accordance with the National Plan, within seven days, and that a request for a rehearing based upon new evidence can be made to the Executive Committee within two weeks of the award. Otherwise, decisions of the Executive Committee are final and "shall be enforced by the ... Trades Council."
 
 
 8
 In 1975, in the course of prior litigation between these unions, the district court directed the parties to petition the JAC to seek referral of their jurisdictional dispute to a Hearings Panel, pursuant to the National Plan. See Drywall Tapers & Pointers, Local 1974 v. Operative Plasterers' & Cement Masons' Int'l Ass'n, 601 F.2d 675, 677 (2d Cir.1979), cert. denied, 444 U.S. 1073, 100 S.Ct. 1018, 62 L.Ed.2d 755 (1980).[2] On March 1, 1978, a Hearings Panel ruled that drywall pointing and taping is painters' work, i.e., Local 1974's work, unless done on surfaces that are to receive plaster, acoustical, or imitation acoustical finishes, in which case it is plasterers' work, i.e., Local 530's work. The crucial portion of the Hearings Panel decision (the "Panel Decision") is paragraph 3:
 
 
 9
 The surface produced by the application of the same plaster pointing material as used in the pointing and taping of the joints to the entire drywall surface for the purpose of producing a uniform surface compatible with the pointed and taped joints shall be considered a plaster finish, and the pointing and taping in connection therewith shall be the work of plasterers.
 
 
 10
 The Panel Decision was accepted and affirmed by this court. See Drywall Tapers & Pointers, 601 F.2d at 679.
 
 
 11
 In 1980, Local 1974 challenged Local 530's right to perform drywall work for a company denominated "Ebasco" at the World Trade Center. In accordance with the New York Plan, the Executive Committee conducted an arbitration hearing. The issue was whether Local 530 was doing just pointing and taping, i.e., work that belonged to Local 1974, or was doing additional work that would bring the job within the province of Local 530 pursuant to paragraph 3 of the Panel Decision. "There was evidence at the hearing," the district court later explained, "that [Local 530] workers at the jobsites had watered down joint compound and spread it over the drywall surface using rollers. The joint compound was a premixed taping compound, not plaster based. The workers coated the drywalls with the diluted compound even though the work was not required by the general contractor's specifications."
 
 
 12
 The Executive Committee decided the Ebasco case in favor of Local 1974 (the "Ebasco Decision"), ruling that "the material applied [by Local 530 members] is not applied for the purpose of producing a uniform surface compatible with the pointed and taped joints," as required by paragraph 3 of the Panel Decision. The Ebasco Decision was published in the Employers' Association handbook. Because Local 530 did not appeal the Ebasco Decision to the Board or request a rehearing, it became, in accordance with the New York Plan, a final decision governing "the awarding of the work of the kind in question on all future jobs."
 
 
 13
 In accordance with the New York Plan, Local 1974 attempted to have the Trades Council enforce the Ebasco Decision both at the Ebasco jobsite and, on the theory that drywall finishing work generally was work "of the kind" performed for Ebasco, at other jobsites. These efforts proved fruitless, despite the Trades Council's clear obligation, under the New York Plan, to enforce the Ebasco Decision. Accordingly, on February 4, 1981, Local 1974 brought this suit, pursuant to 29 U.S.C. § 185(a) (1988), to compel adherence by Local 530 to the Panel Decision and the Ebasco Decision.
 
 
 14
 On May 26, 1981, the district court determined that "Local 1974 is only entitled to an order enjoining Local 530 from asserting jurisdiction over certain drywall taping and pointing work at the Ebasco site. Local 1974 may not have an injunction against Local 530 as to [work at other jobsites.]" The district court refused to issue an injunction as to locations other than Ebasco (even though the Ebasco job had been concluded), reasoning that the organs of the New York Plan were best suited to determine whether Local 530 was engaged at any particular job in "work of the kind" performed for Ebasco. Accordingly, the court also
 
 
 15
 requir[ed] the parties to submit to the organs of the New York Plan for determination the issue as to whether the work at other jobsites is "of the kind" subject to the [Ebasco] award. The court will retain jurisdiction to enforce compliance, if need be, with any final determination of that issue as to any particular jobsite.
 
 
 16
 An order setting forth a preliminary injunction in accordance with these findings was entered by the district court on June 12, 1981.
 
 
 17
 Representatives of Local 1974 and Local 530 met on June 4, 1981 with William Canavan, chairman of the Employers' Association. At that meeting, Local 1974 presented a list of drywall taping and pointing jobs at which Local 530 workers were apparently engaged, and challenged Local 530 to identify listed jobs that were not "of the kind" involved in the Ebasco Decision. Local 530 declined to so identify any particular job. According to Local 1974, however, Canavan made no effort to enforce the Ebasco Decision as to these jobs, but instead stated that the Employers' Association relied on the good faith of the parties to secure adherence to its determinations.
 
 
 18
 Local 1974 then moved before the district court for a preliminary injunction as to work on jobsites throughout New York City. The court denied the motion, reiterating that these determinations should be made by "organs of the New York or National Plans," but added:
 
 
 19
 It may be that the ... Trades Council or the ... Employers' Association or their officers have failed adequately to perform their duties under the New York Plan, or that other individuals or bodies have similarly failed under the National Plan. However, these bodies are not parties to this action. Therefore, at this time the court has no power to direct that they take action.
 
 
 20
 The executive board of the Trades Council (the "Executive Board") held an enforcement hearing on September 21, 1981, but did not render a decision despite follow-up inquiries from Local 1974. The chairman of the Executive Board, Peter Brennan, testified at a deposition that he told Canavan that the Executive Board thought "someone should go on the job site" to investigate the merits of the dispute. Brennan further testified that Canavan said "he thought it was a fair request and ... he would take it from there." In contrast, Canavan testified at deposition that he and Brennan decided against an inspection of the jobsite. Canavan also testified that it would be "futile" for Local 1974 to pursue the matter with the Employers' Association, because Local 1974 had already won all there was to win, "an area-wide final award in the [Ebasco Decision]."
 
 
 21
 Upon Local 1974's renewed motion for a preliminary injunction, the district court reiterated on March 25, 1983 that under the New York Plan, the Trades Council had "the duty to enforce the area-wide awards rendered by the Employers' Association Executive Committee." The court continued:
 
 
 22
 While the [Trades] Council has thus far failed to fulfill its obligations under the New York Plan, it remains the appropriate forum for resolution of this matter. As emphasized in this court's previous memoranda and orders, enforcement of the Executive Committee decision entails job-by-job application and interpretation of the scope of [the Ebasco Decision]. This court's role is confined to enforcement of final decisions over particular jobsites.
 
 
 23
 At this time the Council is not a party to the action. This court is therefore without power to order the Council to fulfill its duties as signatory to the New York Plan. However, if within sixty days plaintiff files motions to amend the complaint and to join the appropriate entities or persons constituting the Council as defendants in this action, this court will consider whether such joinder is proper and, if it is, whether the Council should be ordered to discharge its responsibilities under the jurisdictional agreement into which it has entered.
 
 
 24
 On July 1, 1983, the district court granted Local 1974's motion to amend its complaint to add the Trades Council as a defendant.
 
 
 25
 Apparently prompted by being named a defendant, the Trades Council held an Executive Board hearing on October 26, 1983 at which the presidents of both locals were present. Local 1974 contended at the hearing that Local 530 was violating the Ebasco Decision as a result of work performed by Local 530 members at thirty-one identified locations. Local 530 never argued that the work its members were performing at any of the thirty-one jobs at issue differed from the work they did at the Ebasco site. The Trades Council ruled in favor of Local 1974 on November 7, 1983 as to all thirty-one jobs, adding (as a guide for future disputes): "When a skin [sic] or glazed coat is applied, it will only become the work of the plasterers when it becomes the same thickness over the entire surface as it is over the joints."
 
 
 26
 Local 1974 then moved for a preliminary injunction for the fourth time. On January 3, 1984, the district court entered a preliminary injunction barring Local 530 "from asserting jurisdiction over, and from causing or permitting members of [Local 530] to perform work at," the thirty-one jobsites, which were specifically identified. The case for a permanent injunction was then tried on the five days commencing January 23, 1984, resulting in a permanent injunction corresponding to the preliminary injunction, except for the addition of a thirty-second jobsite that had been added to Local 1974's claim.
 
 
 27
 The permanent injunction also ordered "that defendant ... Trades Council resolve, within thirty days after presentation of evidence by Local 1974, all disputes that fall within the scope of the [Ebasco Decision]. In the event that the Council makes no decision on such disputes, this court will entertain an application for appropriate relief."
 
 
 28
 The district court's opinion granting the permanent injunction included the following description of Local 530's position concerning the controversy:
 
 
 29
 In substance, Local 530 members were alleged to be doing the drywall taping and pointing of the seams and nail heads and then covering the entire wall with a thin skim coat of diluted taping compound applied with a roller and sometimes obtaining such a thin skim coat by applying the taping compound with a knife and scraping it down to a thin coat. Local 530 claimed that the application of this thin "skim coat" of taping compound gave Local 530 jurisdiction over the work.
 
 
 30
 The district court refused, however, to issue an area-wide injunction, i.e., an injunction covering all jobs in New York City. Rather, it said that "[i]f there are other jobs where Local 530 is doing skimcoating with taping compound, Local 1974 should, in accordance with the New York Plan, present those facts to the Council at least in the first instance."
 
 
 31
 This court affirmed the permanent injunction by summary order entered April 13, 1984. See Drywall Tapers & Pointers, 889 F.2d at 392. Nevertheless, Local 530 still failed to withdraw its members from the thirty-two jobsites covered by the permanent injunction. Accordingly, on December 16, 1986, the district court held Local 530 in contempt of its injunctive orders, a ruling which was ultimately affirmed by this court on October 23, 1989. See id. at 395-98.
 
 
 32
 In October 1987, Local 1974 complained to the Trades Council that Local 530 was again performing work in violation of the Ebasco Decision. The Trades Council held hearings on October 19 and November 16, 1987 in response to that complaint. At the November 16 session, Local 1974 presented evidence that the work Local 530's members were performing at forty-one jobsites in New York City was "work of the kind" performed for Ebasco. Local 530 argued that its work involved, in addition to pointing and taping, a legitimate "skimcoating" which differed greatly from that performed at Ebasco. Local 1974 continued to argue that Local 530's "skimcoating" was the same work performed for Ebasco; i.e., applying diluted drywall compound in a haphazard manner serving no purpose except to allow Local 530 to claim that it was doing something beyond taping and pointing.
 
 
 33
 Because the Trades Council still had not acted by March 3, 1988, Local 1974 then renewed its motion for an area-wide injunction or, in the alternative, an injunction as to the forty-one specified job sites. Simultaneously, a hearing panel of the Executive Board issued a report that "found Local Union # 530 not guilty as charged," but went on to recite that "it is difficult to decide if the By-Laws of the ... Trades Council was [sic] violated without having a [sic] impartial person who is qualified to judge the work procedure of these two local unions inspect the work in question on the job site." The report added that "[s]ince the ... Trades Council does not have a procedure for inspecting job cites [sic], it is recommended that the two Local Unions in question ... engag[e] a professional person to perform inspection of the job sites" to determine the issue.
 
 
 34
 Local 1974 then moved for summary judgment and a permanent injunction, contending that "[b]y its 'report,' [the Trades] Council apparently washes its hands of the dispute," and that area-wide relief should therefore be granted to Local 1974. Local 530 cross-moved for summary judgment dismissing the complaint, claiming that the Trades Council report absolved Local 530 from liability. By memorandum and order entered June 22, 1988, the district court denied Local 530's cross-motion, concluding that the Trades Council "[r]eport simply declines to address the issue between the parties and suggests that they get someone else to 'judge' the facts of the dispute." Because of "plaintiffs' inability to obtain an administrative determination of the merits of their claims," the district court referred the matter to Magistrate Judge John Caden "to consider the evidence submitted to the [Trades] Council, take such further evidence as is appropriate, make findings of fact, and issue a Report and Recommendation."
 
 
 35
 Local 530 then requested that the Trades Council reconsider the dispute. At a meeting on September 19, 1988, however, the Executive Board concluded that "it would be of no avail [for it] to hold another hearing on this dispute that is going on for near [sic] 12 years," adding that the Executive Board had "exhausted all means to try to settle this dispute and [would] deny any further hearings concerning this particular matter."
 
 
 36
 The district court subsequently entered an order on February 7, 1989, at the suggestion of the parties, declaring Local 1974's pending motion for summary judgment and a preliminary injunction moot. At that juncture, work on the forty-one sites previously in dispute had been completed.
 
 
 37
 Local 1974 again moved for summary judgment and an area-wide permanent injunction on April 25, 1989. In a memorandum and order entered November 9, 1989, the district court again declined to grant broad injunctive relief. Noting the Trade Council's "express abdication of [its] clear enforcement responsibilities under the New York Plan," however, the court said:
 
 
 38
 As the court has stated, if the enforcement procedures provided by the Plan prove futile to a solution of individual jobsite disputes, the court can and will adjudicate such disputes. That time has come. The court will consider plaintiff's future appeals to the Council to be futile until it reassumes its proper enforcement role.
 
 
 39
 Plaintiff's motion [for an area-wide injunction] is denied. However, plaintiff need not exhaust the ineffective administrative procedures and instead may present its specific claims on particular jobsites to this court to enforce the 1980 arbitration decision. [Citations omitted.]
 
 
 40
 Accepting this invitation, Local 1974 moved on February 16, 1990 for an injunction as to five new jobsites. The motion was referred to Magistrate Judge Caden for findings and a report. The magistrate judge held an extensive hearing in March 1990.
 
 
 41
 On April 6, 1990, Magistrate Judge Caden issued a report recommending a preliminary injunction barring Local 530 from asserting jurisdiction or bargaining rights over drywall taping or pointing work at four of the five contested sites. (He did not recommend an injunction as to the remaining site because there was no evidence that the work there was done pursuant to a collective bargaining agreement with Local 530, or was under its dominion or control.) This ruling was premised upon a finding that "[t]he work performed [by Local 530] at the jobsites in question is not different in any pertinent way from the work performed at the Ebasco site or that challenged in the February 1984 trial."
 
 
 42
 By memorandum and order entered August 16, 1990, the district court, following a de novo review, adopted the magistrate judge's findings as to the evidentiary facts, and issued a preliminary injunction in accordance with the magistrate judge's recommendation. In so ruling, the court noted the requirement of paragraph 3 of the Panel Decision that in order to constitute plasterers' work (and thus fall within the jurisdiction of Local 530), a general drywall coating must be applied "for the purpose of producing a uniform surface compatible with the pointed and taped joints." The court further noted that the Ebasco Decision ruled that the work done by Local 530 at the Ebasco site did not satisfy the quoted requirement. The court then stated that its application of the Ebasco Decision, in issuing a permanent injunction in 1984, had rejected the contention that Local 530 was entitled to jurisdiction at sites where its members applied a "skim" coat consisting of a "thin layer of material over the drywall surface of differing thickness than the taped joints, lacking a uniform appearance;" or "a translucent coat of uneven appearance markedly thinner than the pointed and taped joints."
 
 
 43
 The court concluded that "[i]n substance nothing has changed since either [the Ebasco Decision] or the 1984 hearings," and then stated:
 
 
 44
 Both the [Ebasco Decision and the Panel Decision] allocating jurisdiction between the unions depended on before-the-fact determinations of the types of finishes to be applied at the jobsite. Such judgments manifestly cannot be rendered absent the existence of contractor's specifications--a point emphasized at the Ebasco hearings where no general contractor had requested the drywalls be coated with joint compound. Ebasco thus suggests that without a general contractor's specification requiring skim coating on all drywalls whose joints are taped and pointed, jurisdiction may not be retained by the defendants under paragraph (3) of the 1978 Hearings Panel decision.
 
 
 45
 The district court then enjoined Local 530 from asserting jurisdiction over four of the five jobsites at issue, and concluded by requesting "briefs from counsel as to whether, and if so to what extent, plaintiffs are entitled to an injunction as to all future jobsites where the work meets the conditions and criteria set forth in this memorandum and order."
 
 
 46
 After appropriate submissions by the parties, none of whom requested a further evidentiary hearing, the district court found, in a memorandum and order entered December 26, 1990, "that unless it issues an area-wide injunction, Local 530 will continue to exercise jurisdiction over work that does not belong to it." The court accordingly enjoined Local 530:
 
 
 47
 from asserting jurisdiction over, and from causing or permitting members of [Local 530] to perform work at, any job site in the City of New York unless the owner of the site or the agent of the owner, through architect's specifications or other contractual documents, requires the employer of Local 530 members to skimcoat, as a matter of course, the entire drywall surface in order to eliminate shadowing and color or sheen variations. The court emphasizes that instructions to skimcoat when necessary or if required are not sufficient to vest [Local 530] with jurisdiction over a work-site.
 
 
 48
 Local 530 now appeals from the order granting the area-wide preliminary injunction.
 
 Discussion
 
 49
 Local 530 contends on appeal that the district court erred: (1) by ordering the area-wide injunction without conducting a prior evidentiary hearing; (2) by exercising jurisdiction to enter an area-wide injunction, rather than deferring to the organs established by the National and New York plans; and (3) in its specification of the terms of the area-wide injunction.[3] We find these contentions unpersuasive.
 
 
 50
 A. The Asserted Absence of an Evidentiary Hearing.
 
 
 51
 Local 530 claims that because essential facts pertinent to the nature of its work throughout the New York City area were in dispute, the district court was required to conduct a hearing with oral testimony prior to issuing the area-wide preliminary injunction. Although a hearing is generally required on a motion for a preliminary injunction, see Fengler v. Numismatic Americana, Inc., 832 F.2d 745, 747-48 (2d Cir.1987), "Fengler does not stand for the proposition that a hearing must be held in all preliminary injunction cases." Consolidated Gold Fields PLC v. Minorco, S.A., 871 F.2d 252, 256 (2d Cir.), amended, 890 F.2d 569 (2d Cir.), cert. dismissed, 492 U.S. 939, 110 S.Ct. 29, 106 L.Ed.2d 639 (1989). No hearing was necessary here because "the prior hearings and affidavits, and the court's findings supporting the earlier injunction, provided an adequate basis for the court's decision. The most significant factors [on which the injunction was based] ... would have remained essentially unchanged by any additional evidence." Republic of the Philippines v. New York Land Co., 852 F.2d 33, 37 (2d Cir.1988).
 
 
 52
 Local 530 asserts that the district court's 1984 trial and the magistrate judge's 1990 evidentiary hearing were inadequate to demonstrate that the factors on which the injunction was based would have remained essentially unchanged by additional evidence, because these hearings did not inquire beyond events (1) prior to 1984, or (2) relating to the four job sites covered by the August 1990 injunction. This contention borders on the frivolous. Throughout these protracted proceedings, Local 530 has been unable to distinguish any jobsite, including the four with respect to which it was enjoined in August 1990, from the original Ebasco site. The Trades Council, magistrate judge, and district court have repeatedly found disputed jobsite after disputed jobsite to involve Local 530 performing work "of the kind" it performed for Ebasco. No showing is made that any of these findings was clearly erroneous. The district court was thus amply justified in ruling upon the basis of the thorough written submissions presented by the parties regarding the question of an area-wide injunction.
 
 
 53
 We note, in any event, that Local 530 did not request an additional evidentiary hearing until it had lost at the trial court level. When parties are content in the district court to rest on affidavits, the right to an evidentiary hearing is waived. Consolidated Gold Fields PLC, 871 F.2d at 256; see also Republic of the Philippines, 852 F.2d at 37; Fengler, 832 F.2d at 748; Drywall Tapers & Pointers, 537 F.2d at 674; Firemen's Ins. Co. v. Keating, 753 F.Supp. 1146, 1149 n. 4 (S.D.N.Y.1990).
 
 
 54
 B. Asserted Lack of Jurisdiction to Order an Area-Wide Injunction.
 
 
 55
 Local 530 contends that the district court lacked jurisdiction to enter an area-wide injunction because "its jurisdiction was limited to enforcing decisions of the proper administrative bodies which could only be rendered on a job-by-job basis." Since the district court had "claimed for itself the limited role of the [Trades Council] under the New York Plan," the argument continues, the court's "only powers ... were those allocated to the [Trades Council] under the New York Plan."
 
 
 56
 This contention seriously misapprehends the basis of the district court's jurisdiction, which was premised upon 29 U.S.C. § 185(a) (1988). Section 185(a) explicitly vests district courts with jurisdiction over "[s]uits for violation of contracts between ... labor organization[s] representing employees in an industry affecting commerce." See Wooddell v. International Bhd. of Elec. Workers, Local 71, --- U.S. ----, ----, 112 S.Ct. 494, 496, 116 L.Ed.2d 419 (1991). The district court's subject matter jurisdiction rested squarely on that statutory foundation. It was not limited by the court's discretionary determinations initially to defer to the established administrative mechanisms, and subsequently to act in lieu of them on a case-by-case basis.
 
 
 57
 It is the normal rule, of course, that administrative and contractual remedies should be exhausted. See Glover v. St. Louis-San Francisco Ry. Co., 393 U.S. 324, 329-30, 89 S.Ct. 548, 551, 21 L.Ed.2d 519 (1969). This rule does not apply, however, "where the effort to proceed formally with contractual or administrative remedies would be wholly futile." Id. at 330, 89 S.Ct. at 551; see also Peltzman v. Central Gulf Lines, Inc., 497 F.2d 332, 335 n. 5 (2d Cir.1974); Schum v. South Buffalo Ry. Co., 496 F.2d 328, 330 (2d Cir.1974).
 
 
 58
 That was surely the case here. The Trades Council had explicitly stated that it would "deny any further hearings" concerning the dispute between Local 1974 and Local 530. It would obviously have been pointless to defer to that body.
 
 
 59
 Local 530 alternatively contends that the district court should have compelled arbitration under the National Plan. The Panel Decision was issued pursuant to the National Plan on March 1, 1978, and Local 1974 has been attempting ever since to obtain relief pursuant to its provisions (as implemented in the 1980 Ebasco Decision). The district court was not required to compel Local 1974 to continue down this fruitless road any longer.
 
 
 60
 C. The Terms of the Area-Wide Injunction.
 
 
 61
 Finally, Local 530 maintains that the district court erred in conditioning Local 530's right to do drywall work upon a written contract requiring skimcoating for the purpose of eliminating shadowing and color or sheen variations. Local 530 points out that paragraph 3 of the Panel Decision requires neither of these prerequisites to classifying work as within Local 530's jurisdiction. We disagree with Local 530, and conclude that the injunction was a proper exercise of the district court's broad discretion. See JSG Trading Corp. v. Tray-Wrap, Inc., 917 F.2d 75, 79 (2d Cir.1990); Stormy Clime Ltd. v. ProGroup, Inc., 809 F.2d 971, 973-74 (2d Cir.1987).
 
 
 62
 There was evidence in the record from which the district court could properly conclude that Local 530's "skimcoating" is quite different from a generally accepted process called "skimcoating." A genuine skimcoat of a drywall, it was testified, requires the application of multiple coats of compound to the entire drywall surface, just as are applied to the seams and joints. A genuine skimcoat is used when a wall is damaged or will be exposed to an unusual amount of light. It would be prohibitively expensive to apply genuine skimcoats to wall surfaces generally, and that is not done.
 
 
 63
 This is a far more substantial process than Local 530's "skimcoating," in which one coat of diluted joint compound is applied to the drywall surface and then scraped off, or alternatively such a coat is applied with a roller, resulting (as the district court described it) in a "thin, virtually translucent, blotchy coat, lacking thickness, consistency or uniform appearance." There was also substantial evidence in the record that Local 530's members generally did only pointing and taping work, and that they went beyond that, i.e., applied their version of a "skimcoat," only when Local 1974 was checking the jobsite.
 
 
 64
 Further, the district court noted that both the Panel Decision and the Ebasco Decision "depended on before-the-fact determinations of the types of finishes to be applied at the jobsite," and that "[s]uch judgments manifestly cannot be rendered absent the existence of contractor's specifications--a point emphasized at the Ebasco hearings where no general contractor had requested the drywalls be coated with joint compound." In addition, there was evidence from which the district court could conclude that neither architect's specifications nor contracts ordinarily call for Local 530's variety of "skimcoat." The injunctive provision that a requirement for skimcoating be stated in "architect's specifications or other contractual documents" was thus a legitimate extrapolation from the Panel Decision and Ebasco Decision, especially in the context of a decade's successful efforts by Local 530 to evade and ignore its legal obligations under these decisions and injunctions deriving from them.
 
 
 65
 In sum, the district court was presented with the task of crafting an injunction that would bar Local 530 from diverting drywall work from Local 1974 through the use of a sham "skimcoat," but would not bar Local 530 from doing other work to which it was entitled. Faced with this difficult task, the district court devised a sensible solution. To determine whether Local 530 is doing its sham "skimcoat" to purloin work from Local 1974 or whether it is doing a genuine skimcoat, the district court designed its injunction to require that the jobsite's owner contract for genuine skimcoating, i.e., that which "eliminate[s] shadowing and color or sheen variations."
 
 
 66
 Given Local 530's long and deplorable record of evading the Panel Decision and Ebasco Decision and the injunctions based thereon, it is in no position to assail the district court's choice of an injunction formula that affords Local 1974 a meaningful remedy and is practically administrable. If difficulties are generated by an honest effort to comply with the order of the district court, application for appropriate relief may be made to that court. We find no basis in this record, however, to second guess the district court's effort to bring Local 530 into compliance, at long last, with its manifest legal obligations with respect to this jurisdictional dispute.
 
 Conclusion
 
 67
 The order of the district court granting a preliminary injunction is affirmed.
 
 
 
 *
 The Honorable Joseph T. Sneed, Judge of the United States Court of Appeals for the Ninth Circuit, sitting by designation
 
 
 [1]
 Drywall, or sheetrock, is a material from which walls are made. The surface of drywall is generally suitable for painting. Drywall taping and pointing involves the filling of a seam between adjoining sheets of drywall with taping compound, applying paper tape over the seam, lightly sanding this second coat, and then applying another layer of taping compound over the tape
 
 
 [2]
 For additional prior history of this dispute, see Drywall Tapers & Pointers, Local 1974 v. Local 530 of Operative Plasterers & Cement Masons Int'l Ass'n, 889 F.2d 389 (2d Cir.1989), cert. denied, 494 U.S. 1030, 110 S.Ct. 1478, 108 L.Ed.2d 615 (1990); Drywall Tapers & Pointers, Local 1974 v. Operative Plasterers' & Cement Masons' Int'l Ass'n, 537 F.2d 669 (2d Cir.1976)
 
 
 [3]
 We note also Local 530's argument, which we deem too insubstantial to require further comment in this opinion, that there was "no evidentiary basis" for the four-site injunction, and accordingly (a fortiori ) for the area-wide injunction extrapolated from the four-site injunction