**DRYWALL TAPERS AND POINTERS OF GREATER NEW YORK, LOCAL 1974 OF I.B.P.A.T., AFL–CIO, on its own behalf and on behalf of all persons who are or at any time since March 1, 1978 have been members thereof, John Alfarone, as president, Plaintiffs–Appellants,**

**Daniel Jones, as treasurer of Drywall Tapers and Pointers of Greater New York, Local 1974 of I.B.P.A.T., AFL–CIO, Plaintiff,**

**v.**

**LOCAL 530 OF OPERATIVE PLASTERERS AND CEMENT MASONS INTERNATIONAL ASSOCIATION, Michael Canuso, as president, Louis D. Moscatiello, as secretary-treasurer of Local 530 of Operative Plasterers and Cement Masons International Association, Defendants–Appellees.**

No. 1269, Docket 93–9021.

United States Court of Appeals, Second Circuit.

Argued April 19, 1994.

Decided Sept. 9, 1994.

Daniel E. Clifton, New York City (Lewis, Greenwald, Kennedy, Lewis, Clifton & Schwartz, P.C., of counsel), for plaintiffs-appellants.

Brian E. Maas, New York City (Beldock Levine & Hoffman, of counsel), for defendants-appellees.

Before OAKES, KEARSE, and MAHONEY, Circuit Judges.

MAHONEY, Circuit Judge:

Plaintiffs-appellants Drywall Tapers and Pointers of Greater New York, Local 1974 of I.B.P.A.T., AFL–CIO ("Local 1974") and John Alfarone, its president, appeal from a judgment entered August 25, 1993 in the United States District Court for the Eastern District of New York, Eugene H. Nickerson, *Judge*, that dismissed their action for compensatory and punitive damages against Local 530 of Operative Plasterers and Cement Masons International Association ("Local 530"), Michael Canuso, its president, and Louis D. Moscatiello, its secretary-treasurer. The district court concluded that the applicable union agreements regarding settlement of jurisdictional disputes did not authorize an action for damages, and that it would not exercise its equitable powers to award damages.

We affirm the judgment of the district court.

## Background

The long and tortured history of this case has been described by this court on several occasions. *See Drywall Tapers & Pointers, Local 1974 v. Local 530 of Operative Plasterers and Cement Masons Int'l Ass'n*, 954 F.2d 69 (2d Cir.1992) ("*Drywall IV*"); *Drywall Tapers & Pointers, Local 1974 v. Local 530 of Operative Plasterers & Cement Masons Int'l Ass'n*, 889 F.2d 389 (2d Cir.1989) ("*Drywall III*"), *cert. denied*, 494 U.S. 1030, 110 S.Ct. 1478, 108 L.Ed.2d 615 (1990); *Drywall Tapers & Pointers, Local 1974 v. Operative Plasterers' & Cement Masons' Int'l Ass'n*, 601 F.2d 675 (2d Cir.1979) ("*Drywall II*"), *cert. denied*, 444 U.S. 1073, 100 S.Ct. 1018, 62 L.Ed.2d 755 (1980); *Drywall Tapers & Pointers, Local 1974 v. Operative Plasterers' & Cement Masons' Int'l Ass'n*, 537 F.2d 669 (2d Cir.1976) ("*Drywall I*"). We will not replicate these efforts, but summarize briefly the facts pertinent to this appeal.

Local 1974's members are painters who also provide drywall taping and pointing services, which entails filling seams between adjoining pieces of sheetrock to create a smooth wall finish for painting. Pursuant to a 1961 memorandum of understanding between the parent unions of Local 1974 and Local 530 (the "Parent Unions"),[1] Local 530 had jurisdiction to perform drywall taping and pointing only on walls that must also receive plaster or acoustical finishes. *See Drywall I*, 537 F.2d at 671.

In the 1970s, however, a new drywall preparation technique known as "skimcoating" emerged that was not contemplated by the 1961 Memorandum. Skimcoating entails painting a diluted coating of taping compound (which is not plaster-based) over the entire drywall surface after taping and pointing work is completed, thus creating a plaster-like finish. Because Local 530's members are plasterers, they employed the skimcoating technique in an effort to obtain jurisdiction over preparatory taping and pointing work that otherwise would have gone to Local 1974. *See Drywall IV*, 954 F.2d at 74.

The parent unions are both members of the AFL–CIO and its Building and Construction Trades Department (the "Department"). The Department established a Plan for the Settlement of Jurisdictional Disputes in the Construction Industry (the "National Plan") that prohibits work stoppages during the pendency of a jurisdictional dispute, and also mandates immediate compliance with decisions rendered under the National Plan. Furthermore, the National Plan specifies that the Department and each affiliated union (1) agree that all cases arising under the

---

1. Local 1974's parent union is the International Brotherhood of Painters and Allied Trades; Local 530's parent union is the Operative Plasterers and Cement Masons International Association.

National Plan shall be resolved "as provided [t]herein," and (2) "shall comply with the decisions and rulings" made thereunder.

Under the National Plan, however, if a local plan exists to resolve jurisdictional disputes between unions, that plan must govern "in the first instance." Local 1974 and Local 530 both are subject to the New York Plan for the Settlement of Jurisdictional Disputes (the "New York Plan"), which provides that the procedures outlined therein shall govern all jurisdictional disputes among the signatories. Under the New York Plan, jurisdictional disputes are mediated by the Building and Construction Trades Council of Greater New York (the "Trades Council"), a consortium of trade unions. If the dispute is not resolved through mediation, the union contesting the initial work assignment may seek arbitration before the executive committee of the Building Trades Employers' Association of the City of New York (the "Employers' Association"). The decision of the Employers' Association may be appealed to the Impartial Jurisdictional Disputes Board for the Construction Industry under the New York Plan.

Local 1974 invoked these procedures to achieve numerous rulings in its favor regarding Local 530's efforts to obtain jurisdiction at worksites by using the "skimcoating" technique. However, none of the administrative bodies established under the National and New York Plans took any significant action to enforce these decisions, with the result that the decisions provided no practical relief or benefit to Local 1974. *See Drywall IV,* 954 F.2d at 71–72; *Drywall II,* 601 F.2d at 679. On February 4, 1981, Local 1974 commenced the instant lawsuit, pursuant to 29 U.S.C. § 185(a),[2] seeking judicial relief for Local 530's continuing jurisdictional violations. *See Drywall IV,* 954 F.2d at 72.

Local 1974 sought injunctive relief to enforce its rights at sites that were the subject of jurisdictional disputes with Local 530, and agreed to bifurcate the issue of damages from the trial on the injunction. On April 13, 1984, we affirmed by unpublished order the district court's issuance of a permanent injunction (the "1984 Injunction") that barred Local 530 from asserting jurisdiction over thirty-two specific jobsites (the "Thirty-two Sites") in New York City. *Drywall Tapers v. Local 530,* 742 F.2d 1432 (2d Cir.1984) (table); *see also Drywall III,* 889 F.2d at 392.

When Local 530 thereafter violated the 1984 Injunction, this court affirmed a judgment of civil contempt that ordered Local 530 to pay Local 1974 $542,863.37 for lost earnings, union dues, and fringe benefit payments caused by Local 530's usurpation of taping and pointing jobs. *Drywall III,* 889 F.2d at 398; *id.* at 400 (Mahoney, J., concurring in part and dissenting in part). We subsequently affirmed an area-wide preliminary injunction that prohibited Local 530 from asserting jurisdiction over any construction site in New York City " 'unless the owner of the site or the agent of the owner, through architect's specifications or other contractual documents, requires the employer of Local 530 members to skimcoat, as a matter of course, the entire drywall surface.' " *Drywall IV,* 954 F.2d at 76 (quoting *Drywall Tapers v. Local 530,* No. 81 CV 337, slip op. (E.D.N.Y. Dec. 18, 1990)).

More recently, Local 1974 sought a trial of its claim to compensatory and punitive damages for Local 1974 and its members with respect to jurisdictional violations by Local 530 at the Thirty-two Sites that occurred prior to the issuance of the 1984 Injunction. Local 1974 concedes that it may not recover damages for post–1984 conduct because the National Plan was amended in 1984 to preclude the recovery of damages for "a misassignment of work."[3] Local 530 responded

---

**2.** Section 185(a) provides:

Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

**3.** Specifically, the National Plan adopted in June 1984 provides that the last stage in resolving a jurisdictional dispute shall be arbitration, and that: "The Arbitrator is not authorized to award back pay or any other damages for a misassignment of work."

by moving to dismiss the claims seeking compensatory and punitive damages.

The district court granted Local 530's motion in an unpublished memorandum and order. *Drywall Tapers and Pointers Local 1974 v. Local 530 of Operative Plasterers & Cement Masons Int'l Ass'n.*, No. 81 CV 337, slip op., 1993 WL 738369 (E.D.N.Y. Aug. 23, 1993). The court concluded that although the National Plan, the New York Plan, and the constitutions of the Department and the Trades Council were "contracts" within the meaning of, and therefore enforceable under, 29 U.S.C. § 185(a), *id.*, slip op. at 6; *see supra* note 2, none of them provided "an objective indication that the contracting parties agreed to the imposition of monetary damages in the event one contracting local willfully or negligently assume[d] jurisdiction over work that should have been assigned to another local." *Id.*, slip op. at 6–7. The district court also declined to exercise its "broad equitable authority" to provide damages relief. *Id.*, slip op. at 12–13.

This appeal followed.

### Discussion

"We review *de novo* [a] district court's dismissal under Rule 12(b)(6), taking as true the factual allegations in the complaint, and drawing all reasonable inferences therefrom in [the plaintiff's] favor." *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 765 (2d Cir.1994); *see also Christ Gatzonis Elec. Contractor, Inc. v. New York City Sch. Constr. Auth.*, 23 F.3d 636, 639 (2d Cir.1994); *Ferran v. Town of Nassau*, 11 F.3d 21, 22 (2d Cir.1993), petition for *cert. filed* May 26, 1994 (No. 93–9758).

Local 1974 effectively concedes on appeal that it cannot premise any damage recovery upon the explicit provisions of any of the contracts that are at issue in this case, and does not challenge Judge Nickerson's conclusions that all of the pertinent documents are silent as to the availability of damages. We accordingly adopt and rely upon Judge Nickerson's discussion of the particular provisions of these contracts, and address only the arguments that Local 1974 advances on this appeal.

Local 1974 contends that § 185(a) is a source of substantive rights, as well as federal jurisdiction, and should be construed to authorize damages relief in this case. Local 1974 cites in support of this position *Local # 1547, International Brotherhood of Electrical Workers v. Local # 959, International Brotherhood of Teamsters*, 507 F.2d 872, 878–79 (9th Cir.1974). In that case, the two locals had a "no-raid" agreement, but Local 959 nonetheless filed a petition for certification with the NLRB when Local 1547's contract with an employer expired, and won the ensuing certification election. *Id.* at 873–74.

Local 1547 sued to enjoin the NLRB from effectuating Local 959's victory in the election, and also sought damages from Local 959. *Id.* at 874. The Ninth Circuit affirmed a summary judgment that barred specific enforcement of the no-raid agreement, deferring to the authority of the NLRB to conduct a certification election, *id.* at 875–78, but remanded for a trial on the issue of damages. *Id.* at 878–79. In doing so, it said: "There may be cases in which bad faith or predatory organizing practices are so patently offensive to the orderly resolution of interunion competition that recourse to damages should be available as a contractual remedy." *Id.* at 878.

 We have no quarrel with the Ninth Circuit's conclusion that in some exceptional cases, damages should be available as a contractual remedy in interunion contractual disputes. In that case, however, Local 1547 had no avenue of relief other than a damages remedy, specific enforcement of the "no-raid" agreement having been denied, and the raid having been successfully consummated.

In the instant case, by contrast, an area-wide injunction has been entered against Local 530, which has already been subjected to substantial monetary contempt sanctions in *Drywall III*. In addition, Local 1974 has commenced an action seeking monetary contempt sanctions against Local 530 for violation of the area-wide injunction.

Further, Judge Nickerson did not rely exclusively upon the absence of any explicit provision for money damages in the governing contracts. He also pointed to an amicus

brief filed with this court in 1977 by the Joint Administrative Committee charged with administering and interpreting the National Plan, which stated:

A close reading of the [Department] Constitution and the [National] Plan clearly indicates that it was never the intent of the Plan to give local or international unions or individual members of local unions the right to claim damages from a misassignment of work.

The brief further explained:

[T]he intent of the parties to the Plan is to have jurisdictional issues resolved without resort to the courts. Contractor participation in the Plan is voluntary. Indeed, if parties are faced with the possibility of legal action for damages by aggrieved members of a union who lost work by virtue of a misassignment by the contractor, very few contractors or unions would be willing to continue to participate in the Plan. Failure to obtain widespread voluntary support of the Plan by contractors would result in the destruction of the Plan.

These statements strongly indicate that the 1984 amendment of the National Plan to explicitly exclude money damages for "a misassignment of work," *see supra* note 3, was a clarification of longstanding policy, rather than a change in that policy. It follows that if the 1984 amendment is viewed as clarifying the prior implicit intent of the National Plan (stated explicitly in the 1977 amicus brief), the same result should follow under the pre–1984 version of the National Plan.

Local 1974 invokes both scholarly and case support for the proposition that damages are the normal remedy for a breach of contract. This general rule must be qualified, however, in the context presented by this case. As we stated in *Association of Contracting Plumbers v. Local Union No. 2 United Association of Journeymen and Apprentices of the Plumbing & Pipefitting Industry*, 841 F.2d 461, 468 (2d Cir.1988): "Where labor unions provide through a parent organization an orderly means of resolving jurisdictional disputes among themselves, thus avoiding strikes and other labor disputes, there is a strong public interest in recognizing the authority of the parent union." Thus, in *Dry-*

*wall II*, we dismissed a prior action brought by Local 1974 against Local 530 because, "the [jurisdictional] issue having been fully resolved pursuant to established industrial arbitration procedures[,] there was no reason to entertain the lawsuit." 601 F.2d at 676. *Cf. Merk v. Jewel Food Stores Division of Jewel Cos.*, 945 F.2d 889, 893 (7th Cir.1991) ("As the Supreme Court has recognized, a collective bargaining agreement is more than just a contract—it erects a system of industrial self-government."), *cert. denied,* —— U.S. ——, 112 S.Ct. 1951, 118 L.Ed.2d 555 (1992); *Sheet Metal Workers' Int'l Ass'n Local Union No. 104 v. Natkin & Co.*, No. C–93–3047, 1994 WL 361829, at *2 (N.D.Cal. July 6, 1994) ("Where there is a collective bargaining agreement providing grievance procedures for a covered dispute, those procedures must be used....").

Both the 1977 amicus brief and Judge Nickerson's ruling in this case stress that the National Plan prohibits work stoppages during a jurisdictional dispute, and that an award of damages for continuing work during the resolution of such a dispute would impose crippling financial penalties for complying with this mandate of the National Plan. *See Laborers Local 91, Laborers Int'l Union v. Building Indus. Employers Ass'n,* No. CIV–80–654E, 1986 WL 3804, at *5 (W.D.N.Y. Mar. 26, 1986) (National Plan does not envision award of damages in jurisdictional disputes). Local 1974 argues that this policy may be observed by precluding damages for work performed prior to a definitive administrative resolution of a jurisdictional dispute pursuant to the National Plan, but making damages available for refusal (such as Local 530's in this case) to comply with those resolutions. Judge Nickerson, who has superintended this litigation for more than a decade, deemed it inappropriate to go beyond the provisions of the relevant interunion agreements to provide damages for asserted jurisdictional violations that occurred prior to decisive court intervention in the form of the 1984 Injunction. Without intending to provide any general rule for all future disputes of this nature, we perceive no basis to disturb his resolution of the damages issue in this case.

■ Finding no basis for an award of compensatory damages, Judge Nickerson did not separately address the question of punitive damages. In any event, regardless of the availability of compensatory damages, punitive damages generally may not be awarded in a § 185(a) breach of contract action. *See Moore v. Local Union 569 of the Int'l Bhd. of Elec. Workers*, 989 F.2d 1534, 1542 (9th Cir. 1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1066, 127 L.Ed.2d 385 (1994); *Merk*, 945 F.2d at 899; *Holodnak v. Avco Corp.*, 514 F.2d 285, 292–93 (2d Cir.), *cert. denied*, 423 U.S. 892, 96 S.Ct. 188, 46 L.Ed.2d 123 (1975).

We reiterate in conclusion that the outstanding area-wide injunction, and contempt sanctions thereunder, are now in place to protect Local 1974 against any further jurisdictional incursions by Local 530. As we made clear in *Drywall III,* the district court may award compensatory damages for lost man hours, union dues, and fringe benefit payments resulting from any future contempt by Local 530. *See* 889 F.2d at 398.

Conclusion

The judgment of the district court is affirmed.