COURT OF APPEALS OF VIRGINIA

Present:   Judges Athey, Fulton and Lorish
Argued by videoconference

PAUL S. RICHTER

MEMORANDUM OPINION* BY
v.        Record No. 1468-24-4          JUDGE LISA M. LORISH
DECEMBER 30, 2025

ESTATE OF GERALDINE RICHTER,
 BY KELLY K. RICHTER,
 PERSONAL REPRESENTATIVE

FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
David Bernhard, Judge[1]

Thomas P. Miller (Richter, Miller & Finn, on briefs), for appellant.

Donna Dougherty (Family Law Group, on brief), for appellee.

A court has inherent authority to hold a party in contempt for violating its orders. Because this power is so vast, "before a person may be held in contempt for violating a court order, the order must be in definite terms as to the duties thereby imposed upon him and the command must be expressed rather than implied." *Winn v. Winn*, 218 Va. 8, 10 (1977). We conclude the circuit court erred by holding Paul Richter in contempt of a marital Settlement Agreement, incorporated as part of a final divorce decree in 1988, for failing to sell a piece of property. The plain language of the Settlement Agreement gave Paul the "sole discretion as to how, when and upon what terms and conditions such property is sold." While, overall, the Settlement Agreement suggests the parties *intended* for the property to be sold before 36 years

---

\* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

[1] The Honorable David Bernhard presided over the proceedings below.  Now a member of this Court, Judge Bernhard took no part in this decision.

had passed, implication alone is not grounds for a contempt finding. Thus, we reverse and remand.[2]

BACKGROUND[3]

Paul and Geraldine Richter divorced on May 27, 1988. The final decree of divorce incorporated a Settlement Agreement dated April 6, 1988, wherein the parties agreed on how to dispose of their assets.

Thirty-five years later, Geraldine filed a "Motion to Enforce the Settlement Agreement, or in the Alternative, for Declaratory Relief that the Settlement Agreement is Void *Ab Initio*."

The Settlement Agreement set out the parties' division of "their property, retirement plan, support and other economic rights and obligations." The Settlement Agreement also dealt with the resolution of the parties' outstanding litigation and addressed different groups of real properties the couple owned during the marriage.

For example, under Paragraph 7, Paul was required to "cause [RKR Properties Partnership] to deed all of its interest in the 8600-8620 Rolling Road Real Property to [Geraldine] as of December 31, 1987 subject to the existing deed of trust on that property."[4] Further, "[Geraldine] alone shall be fully responsible for all deed of trust note payments relating to that property now or hereafter due." And, relevant here, under Paragraph 9, "[Geraldine] shall

---

[2] We deny Paul's motion for leave to file an appendix.

[3] This record was sealed. To the extent this opinion discusses facts contained in the record, we unseal only the specific facts stated in this opinion; the remainder of the record remains sealed. *Brown v. Va. State Bar ex rel. Sixth Dist. Comm.*, 302 Va. 234, 240 n.2 (2023); *Levick v. MacDougall*, 294 Va. 283, 288 n.1 (2017).

[4] The Rolling Road properties contained a commercial unit with Geraldine's physical therapy practice. As part of the Settlement Agreement, Paul relinquished all of his interests in that property, the physical therapy practice itself, and the equipment.

deed all of her interests in the Catharpin Real Properties to [Paul], subject to the existing deed of trust.  [Paul] alone shall be responsible for all deed of trust note payments now or hereafter due."

The Catharpin properties made up 17 acres of land in total and contained the residence where the family lived before the divorce was finalized in 1988.  Paul continued to live in the family home after the divorce.  At one point, Geraldine also lived there again, from roughly 1993 to 1996.  In 2009, Paul moved his legal offices into the residence.  He still lives in the marital residence at the time of this appeal.

Paragraph 9 of the Settlement Agreement contained additional language about the Catharpin properties that underlies the current dispute:

> [Paul] agrees that he will sell the Catharpin property having the residence on it and that out of the proceeds of such sale, he will give [Geraldine] $100,000 in cash.  [Paul] shall have the sole discretion as to how, when and upon what terms and conditions such property is sold.  In the event [Geraldine] procures a purchaser for such property so that no real estate brokerage commission is otherwise payable on the sale by [Paul], [Paul] shall pay [Geraldine] an additional cash amount equal to 4% of the sales price upon closing on such sale.

Also relevant here, Paragraph 35 of the Settlement Agreement states:

> [Paul] agrees promptly after execution of this Settlement Agreement to prepare and submit to [Geraldine] an outline and time schedule for implementation of the Settlement Agreement.  [Paul] shall also promptly begin preparation of all other instruments, documents, joint motions, decrees, orders and other papers which will be required for implementation of this Settlement Agreement for review by [Geraldine] and her counsel.

Shortly after issuance of the final divorce decree, Paul gave Geraldine a redlined version of the Settlement Agreement in which he had worked with both parties' counsel to assign priority levels to each task.  Next to Paragraph 9, he simply wrote "to be determined."

When Geraldine in February 2023 filed the motion to enforce the Settlement Agreement, or in the alternative to have it declared void ab initio, the parties had tried and failed to resolve

their dispute over the Catharpin properties. By the time Geraldine was about to remarry in 2000, she had not deeded her interest in the properties to Paul, and Paul sent a letter to Geraldine warning her that she should deed her interests in the property "to avoid future, unnecessary complications and unpleasantness with [her] new husband." Geraldine ignored the message. Over the next few decades, the parties did not speak about the disposition of the property. Geraldine did not nudge Paul to sell the house because, as she explained during trial, "I had three little children. I had an exhausting career. I was tired of the vexatious litigation. I wanted to move on with my life."

Then, in September 2019, Paul, who had still not sold the property, emailed Geraldine, who had still not quitclaimed her interest to Paul.[5] He stated, "While [the] residence will eventually have to be sold, I presently have no intention of selling it in the foreseeable future." He offered to pay her $100,000 cash in exchange for her remaining interest in the property. After two months passed with no response, he followed up to reiterate his offer, warning that he might take legal action to compel the deeds should Geraldine not respond.

About two years later, in September 2021, Geraldine wrote to Paul, through counsel, that she considered the agreement void ab initio and demanded a sale of the property with compensation for her 50% interest.[6] Paul responded by filing a quiet title action in Prince William Circuit Court and urging Geraldine to accept his preexisting $100,000 offer or he would "proceed rapidly with discovery and may add additional claims or parties."

---

[5] Paul explained that he had not sold the property because he was still residing there, and Geraldine explained she had not deeded her interests because of her "ongoing distrust" of Paul.

[6] At this point, Geraldine decided to take the issue back up because she fell ill and did not know how much time she had left to get her affairs in order for her children. She explained that she did not want the testamentary issues to outlast her and burden her children.

In the present litigation, Geraldine asked the Fairfax Circuit Court to (i) declare that Paul violated the 1988 order, (ii) order Paul to produce a time schedule for the sale, and (iii) order Paul to pay Geraldine the $100,000 plus one-half of the current value of the property. In the alternative, Geraldine asked the court to find that the agreement was unconscionable and therefore void ab initio and declare that the parties shared equal interests in the property. She also asked the court to award her attorney fees. Paul moved to strike or dismiss, filed a demurrer, and asserted a plea in bar that Geraldine lost the ability to bring action 20 years after the final decree was entered. The court denied Paul's relevant motions in a May 19, 2023 order, and the parties then engaged in extensive, embittered litigation on the matter.

Through her motion to enforce the Settlement Agreement, Geraldine sought either $314,000 in damages (calculated by adding "the $100,000 due under the Settlement Agreement under a 1988 valuation plus interest and damages due to [Paul's] unreasonable delay") or "one-half of the current value of the Catharpin Residence Property." At a hearing, the circuit court explained that a motion to enforce was a limited procedural device. The court told Geraldine's counsel that under Code § 20-107.3, the court could "appoint a commissioner of sale [and] . . . just order the property sold," but that sale would only trigger a $100,000 payment to Geraldine under the Settlement Agreement. Indeed, the court ultimately held that "the Motion to Enforce power of the Court in the context of this cause is limited by statute to the sale of the property via a special commissioner of sale and does not include awarding compensatory damages or prejudgment issue."[7]

The court encouraged Geraldine to instead proceed with a rule to enforce, which would give the circuit court "the wide latitude of civil contempt and [the court] could do a lot of

---

[7] In its final letter opinion, the court explained that the court "opined its powers to enforce court orders are significantly limited when not proceeding by Rule to Show Cause."

- 5 -

things." Geraldine's counsel explained that she had not filed a "rule saying that he had failed to sell the property" because she thought "it would have been preliminary because the Court had not resolved [] a conflict between the parties" over when the property needed to be sold. Geraldine's counsel noted that in her "experience in this court and in other courts . . . if the agreement is unclear, then this court doesn't have [] an ability to even issue a rule."

But after this hearing, Geraldine heeded the court's advice and filed a rule against Paul, urging the court to find him in contempt of the prior order incorporating the Settlement Agreement. Paul responded with an answer and affirmative defenses, including that Geraldine had waited too long to pursue the claim and was therefore barred by the doctrine of laches. He also filed a counterclaim for money from Geraldine's pension that he alleged was never paid to him under the Settlement Agreement.

After a three-day trial, the circuit court held Paul was "in violation of the Decree in not previously selling the marital home and paying Defendant her $100,000." The court found Paul's "failure to take *any* action 'promptly' to sell the property during the last 36 years is thus in clear contempt of a specific command by this Court." The court also found that Paul's defense of laches did not apply because Paul had only benefited from the delay and did not experience any prejudice. The court also found it could not take up Paul's counterclaim for $25,000 because Paul had failed to file a rule against Geraldine and instead tried to make this claim as "an affirmative defense to disobedience of a court order."

To determine damages for Paul's contempt, the court applied the *Brandenburg* formula to account for the "increase in value of her $100,000 portion from the marital residence due as of 1996 when Defendant last moved out of the home." The court found that forcing the sale of the house was no longer "viable as it would result in [Geraldine] not being paid the full value of her equitable distribution award accounting for the appreciation in her unsold interest in the marital

- 6 -

home, and would conversely result in significant adverse tax consequences to [Paul]." The court entered a separate order holding Paul in civil contempt and awarding Geraldine $243,729 in damages and $80,000 in attorney fees.

Paul timely appealed and tendered bond of $343,152. Geraldine passed away due to her terminal illness after the trial, and her estate defends the judgment below.

ANALYSIS

Paul assigns error to eight aspects of the court's ruling. Because we conclude that the Settlement Agreement is ambiguous about the deadline for Paul to sell the Catharpin Properties, we find that the circuit court abused its discretion by holding Paul in contempt for violating the final divorce decree incorporating the Settlement Agreement. This issue is a threshold one, and having concluded no contempt could lie, we do not reach the other errors assigned.

We review a court's decision to exercise "contempt power under an abuse of discretion standard." *Mills v. Mills*, 70 Va. App. 362, 373 (2019) (quoting *Zedan v. Westheim*, 60 Va. App. 556, 574 (2012)). A court has "broad discretion to fashion a sanction," including civil compensatory damages and attorney fee awards. *Koons v. Crane*, 72 Va. App. 720, 739 (2021). But a court "by definition abuses its discretion when it makes an error of law." *Shooltz v. Shooltz*, 27 Va. App. 264, 271 (1998). The contempt finding here rests on the court's interpretation of the parties' settlement agreement. "[S]ettlement agreements are contracts and are subject to the same rules of construction that apply to the interpretation of contracts generally." *Southerland v. Est. of Southerland*, 249 Va. 584, 588 (1995). "The interpretation of a contract is a question of law that this [C]ourt reviews de novo." *Bolton v. McKinney*, 299 Va. 550, 554 (2021).

A court always "has discretion in the exercise of its contempt power." *Petrosinelli v. People for the Ethical Treatment of Animals*, 273 Va. 700, 706 (2007). It is within a trial court's

- 7 -

discretion to conduct civil contempt proceedings. *Id.* What is true in general is true specifically

when a court seeks to "effectuate and enforce" equitable distribution determinations in orders of

divorce. Code § 20-107.3(K). When a judge enters an order incorporating an agreement by the

parties as to the distribution of their property, the court's contempt power may enforce that

agreement. *See Shoosmith v. Scott*, 217 Va. 789 (1977) (citing Code § 20-109.1).

But the "judicial contempt power is a potent weapon." *Petrosinelli*, 273 Va. at 706

(quoting *Int'l Longshoremen's Ass'n, Local 1291 v. Philadelphia Marine Trade Ass'n*, 389 U.S.

64, 76 (1967)). Thus, "our centuries-old jurisprudence has long provided that 'contempt lies for

disobedience of what is decreed, not for what may be decreed.'" *Id.* at 706-07 (quoting

*Taliaferro v. Horde*, 22 Va. (1 Rand.) 242, 247 (1822)). And, "before a person may be held in

contempt for violating a court order, the order must be in definite terms as to the duties thereby

imposed upon him and the command must be expressed rather than implied." *Winn*, 218 Va. at

10.

"[T]o hold a litigant in contempt, the litigant must be 'acting in bad faith or [in] willful

disobedience of [the court's] order.'" *Koons*, 72 Va. App. at 737 (alterations in original)

(quoting *Zedan*, 60 Va. App. at 574-75). But bad faith is irrelevant if the order did not

unambiguously require the party to take a given action. Thus, the first step in the contempt

inquiry is determining whether the order (in this case, the settlement agreement) was clear in

setting out the given duty.

To interpret the settlement agreement, we apply ordinary contract principles. "In

reviewing a property settlement agreement, the court must determine 'the intent of the parties

and the meaning of the language . . . from an examination of the entire instrument, giving full

effect to the words the parties actually used.'" *Price v. Peek*, 72 Va. App. 640, 646 (2020)

(alteration in original) (citing *Jones v. Gates*, 68 Va. App. 100, 105 (2017)). Whether a contract

is ambiguous is a question of law. *Bergman v. Bergman*, 25 Va. App. 204, 211 (1997). A contract is ambiguous if "language admits of being understood in more than one way or refers to two or more things at the same time." *Smith v. Smith*, 3 Va. App. 510, 513 (1986) (quoting *Renner Plumbing v. Renner*, 225 Va. 508, 515 (1983)).

We also are guided by a series of decisions from the Supreme Court, each reversing contempt convictions, which reveal just how explicit the underlying mandate must be. If there is any ambiguity in the order or incorporated settlement agreement, contempt will not lie. Take *French v. Pobst*, 203 Va. 704 (1962), which involved a special commissioner of the court, French, who refused to pay into the court money that was in his hands as the commissioner. The court issued a judgment and order for a second commissioner, Pobst, and "against the said G. Mark French individually for the sum of $2,017.16 with interest and costs." *Id.* at 710. French still refused to pay the money, and the court held him in contempt for failing to "pay over the monies required by [of] him by the order of this Court on July 27, 1960." *Id.* at 705 (alteration in original). But the Supreme Court reversed. *Id.* The Court underscored that—while there was a "conflict of authority on the question whether a decree or order which merely declares the rights of the parties without an express command or prohibition may be the basis of a contempt proceeding"—"the better and safer rule is that there must be an express command or prohibition." *Id.* at 710. The court's order no doubt required French to pay the judgment he owed, but it lacked any express command or direction requiring payment. In essence, the contempt order was premature because the court had not yet ordered him to pay the judgment by a date certain. For contempt to be appropriate and timely, the Court explained that "[t]he circuit court may thereupon enter a further decree specifically commanding French to pay the judgment of July 27, 1960, and proceed by rule for contempt if its command is not obeyed." *Id.*

- 9 -

The Supreme Court then applied the same principle—that the command must be unambiguous—in a case where a final decree of divorce incorporated a settlement agreement. *Winn*, 218 Va. at 9. There, the agreement stated that "Husband agrees that he will maintain for a period of two years from the execution of this Agreement the present group hospitalization policy carried on the Wife through the Traveler's Insurance Company, or a similar policy containing substantially the same benefits . . . ." *Id.* (alteration in original). After entry of the divorce decree, the husband maintained the existing policy, but the insurer refused to cover the wife's medical expenses because her divorce "had become final." *Id.* The trial court held the husband in contempt for failing to maintain insurance that would cover the wife, but the Supreme Court again reversed. *Id.* The Court explained that "[i]t well may be that[] . . . [the parties] intended the husband's obligation to be absolute[—]if intervention of the divorce should have the effect of voiding the wife's coverage under the [existing] policy, it was his duty to procure other insurance guaranteeing her substantially the same benefits she had as his undivorced wife." *Id.* at 10. But the Court found "if this was the husband's duty, it was not expressed in definite terms in the agreement, as incorporated into the divorce decree." *Id.* Instead, "[i]f the duty existed at all, it arose only by implication." *Id.*

Next, the Supreme Court reversed a finding of contempt based on a failure to pay attorney fees as required by a property settlement agreement that was incorporated into a final divorce. *Shebelskie v. Brown*, 287 Va. 18, 33 (2014). There, wife was required to sell a piece of property by a certain date, and then to "pay all costs and attorney[] fees incurred by [husband] for this matter . . . and an additional $12,500." *Id.* at 22. The day after the order was entered, wife's counsel reached out to husband to confirm the amount of his attorney fees, which totaled $3,815.50. *Id.* Wife then sold the property, but did not pay husband, suggesting instead that husband offset the $12,500 plus the $3,815.50 of attorney fees and costs from money he owed

- 10 -

her in connection with their divorce. *Id.* Husband rejected this proposal, and when wife still had not paid two weeks later, he filed a motion for the issuance of a rule to show cause for her failure to follow the court's order. *Id.* at 23. The circuit court found her in contempt, but the Supreme Court reversed, concluding that the "April order did 'not express[] in definite terms,' the total amount to be paid by [wife] and 'express[ly] command[ed]' only that [wife] pay [husband] 'an additional $12,500.'" *Id.* at 32 (first, third, and fourth alterations in original) (first quoting *Winn*, 218 Va. at 10; and then quoting *Petrosinelli*, 273 Va. at 707). In addition, "[t]he order also failed to specify when [wife] was to pay the undetermined amount, and the order was not final." *Id.* The Court specifically rejected the argument that the order implied wife had the "obligation to pay a certain amount by a specific date," underscoring again that contempt could not be based on a duty that arises by implication. *Id.*

Finally, the Supreme Court reversed another finding of contempt where an order required certain future action but "left unresolved any issues surrounding [a] future failure to pay and any consequent damages." *DRHI, Inc. v. Hanback*, 288 Va. 249, 255 (2014). The underlying order resolved a dispute between the parties on whether Hanback was required to sell property to DRHI. *Id.* at 249-50. Concluding the contract between the parties was valid, the court "ordered DRHI to pay Hanback $400,000, minus the $10,000 already paid." *Id.* at 254. The order also dictated

> that at the time any subdivision plans submitted by DRHI, Inc. for the development of the property sold by Mr. Hanback are approved by the City of Fairfax, in the event that the plans submitted by DRHI, Inc. permit the construction of six or more individual residences, DRHI, Inc. shall pay to Mr. Hanback $70,000.00 for the sixth lot and $70,000 for each additional approved lot thereafter.

*Id.* at 254-55.

The subdivision plans were ultimately approved, and DRHI refused to pay the additional $70,000 per lot.  But the Supreme Court concluded that DRHI could not be held in contempt for violating the court's order.  The first problem was that the underlying order was "not an enforceable judgment in favor of Hanback." *Id.* at 255.  The second problem was that "no finite amount of damages was identified." *Id.*  Third, the order "left open" the "additional amount DRHI might owe to Hanback." *Id.*  And finally, the amount DRHI owed Hanback "was dependent on numerous factors which had not occurred as of [the date of the order]."[8] *Id.*

As these cases illustrate, an order must be exacting in its clarity—unambiguously requiring a party to take a specific action—before the party can be held in contempt for not taking that action.  There must be "no objectively reasonable basis for concluding that the . . . conduct might be lawful." *Taggart v. Lorenzen*, 587 U.S. 554, 557 (2019).[9]  Given this high

---

[8] Other cases illustrate the same principles. *See also Petrosinelli*, 273 Va. at 709 (reversing a contempt finding because the alleged underlying duty was implied, not expressed); *Crumpler v. Stark*, No. 230606, slip op. at 5, 2024 Va. Unpub. LEXIS 6, at *9 (Aug. 8, 2024) (order) (affirming, in part, this Court's reversal of a contempt finding because the circuit court's injunction did not "provide sufficient specificity or certainty to hold the [appellants] in contempt for violation of the trial court's order under the present circumstances").

[9] Our courts have often relied on federal cases in setting out the bounds of the contempt power. *See, e.g.*, *Petrosinelli*, 273 Va. at 706 (quoting *Int'l Longshoremen's Ass'n, Local 1291*, 389 U.S. at 76); *Scialdone v. Commonwealth*, 279 Va. 422, 442 (2010) (quoting *Cooke v. United States*, 267 U.S. 517, 539 (1925)).  And the federal circuits, considering the question in published opinions, have concluded that determining whether an order was sufficiently "clear and unambiguous" requires reading the order in a light favorable to the person charged with contempt. *See Project B.A.S.I.C. v. Kemp*, 947 F.2d 11, 16 (1st Cir. 1991) ("[A]ny ambiguities or uncertainties in such a court order must be read in a light favorable to the person charged with contempt."); *see also Drywall Tapers & Pointers, Local 1974 etc. v. Local 530 of Operative Plasterers & Cement Masons Int'l Ass'n*, 889 F.2d 389, 400 (2d Cir. 1989) (Mahoney, J., concurring in part and dissenting in part) ("[T]he longstanding, salutary rule in contempt cases is that ambiguities and omissions in orders redound to the benefit of the person charged with contempt." (quoting *Ford v. Kammerer*, 450 F.2d 279, 280 (3d Cir. 1971))); *Grace v. Ctr. for Auto Safety*, 72 F.3d 1236, 1241 (6th Cir. 1996) ("[A]mbiguities must be resolved in favor of persons charged with contempt."); *Keyes v. Sch. Dist. No. 1*, 895 F.2d 659, 669 (10th Cir. 1990) ("Should contempt proceedings ever be necessary, of course, any ambiguity in the injunction will inhere to the [charged party's] benefit.").  While this logic is persuasive, we do not rely on

- 12 -

standard, this Court has repeatedly reversed findings of civil contempt when an underlying order obviously intended a result but did not specifically compel that result.[10]

With these background principles in mind, we turn to the contempt finding here. The first question is which of Paul's actions the court found to be contemptuous of the 1988 decree incorporating the Settlement Agreement. There are two key parts of the Settlement Agreement: Paragraph 9, which sets out Paul's obligations regarding the Catharpin properties, and Paragraph 35, which sets out Paul's obligation to promptly provide an outline and schedule for implementation of the Settlement Agreement. Geraldine's rule to show cause asked the circuit

this rule here since the Richters' Settlement Agreement did not impose an express duty on Paul to sell by a certain date in any light.

[10] *See, e.g.*, *O'Brien v. Riggins*, No. 2421-99-4, 2000 Va. App. LEXIS 811 (Dec. 12, 2000) (reversing a contempt finding because, although the mother's moving out of state rendered the parties' visitation schedule unworkable, it was not expressly prohibited by the final divorce decree); *Hughes v. Hughes*, No. 2602-09-4, slip op. at 5-6, 2010 Va. App. LEXIS 361, at *8 (Sep. 7, 2010) (agreeing with the lower court that the husband violated the marital Settlement Agreement, but overturning the contempt ruling because the underlying duty was implied, not expressed); *Wilson v. Collins*, 27 Va. App. 411, 424-25 (1998) (reversing the trial court's finding of contempt where the husband did not give the wife a copy of a life insurance policy because that duty was merely implied from the requirement that he keep a policy in effect of which the wife approved); *Friedman v. Smith*, Nos. 0117-22-1, 0495-22-1, slip op. at 7-8, 2023 Va. App. LEXIS 37, at *10 (Jan. 24, 2023) (finding the trial court abused its discretion in holding one appellant in contempt but affirming with regard to the second appellant where the second but not the first had violated a specific prohibition); *Aviles v. Lewis*, No. 1780-17-4, 2018 Va. App. LEXIS 177 (July 3, 2018) (reversing contempt judgment against father for failure to inform mother of the date of their child's first communion because there was merely a duty to consult about the child's religion, not specifically to inform about dates of religious ceremonies); *Metcalf v. Metcalf*, No. 1208-01-4, 2002 Va. App. LEXIS 208 (Apr. 2, 2002) (reversing a contempt order where the obligation that the husband maintain the wife as beneficiary of a specified sum for the duration of his spousal support obligation was not expressed in definite terms in the agreement and thus the husband did not violate a clearly defined duty); *Matrix Mech. Corp. v. Harrison*, Nos. 2068-96-4, 2069-96-4, slip op. at 5-6, 1997 Va. App. LEXIS 176, at *7 (Mar. 25, 1997) (reversing a contempt judgment for failure to deliver a deed because, although delivery was necessary to give the underlying order meaning, the order only required "execution" within five days, not delivery); *Hanson v. Commonwealth*, No. 2899-95-3, slip op. at 12, 1997 Va. App. LEXIS 206, at *15 (Apr. 1, 1997) (ruling that the trial court abused its discretion in holding mother in contempt for failure to complete an alcohol abuse evaluation because the relevant order did not place a time limit by which the evaluation was to be completed, nor did the evidence prove that time was of the essence).

- 13 -

court to read these two paragraphs together and find Paul in contempt for (1) failing to promptly sell the Catharpin properties and (2) failing to promptly provide an outline and schedule for implementation of the Settlement Agreement.

The circuit court appears to have found Paul in contempt of failing to promptly sell the Catharpin properties. The introduction to the court's letter opinion based its finding of contempt on "the failure of Plaintiff to sell the property." The heading for the contempt section of the opinion is titled "[Paul] is in Civil Contempt of Court in Failing to Sell the Property," and that section ends with the conclusion that "[i]t is transparently obvious [Paul] disobeyed the command to sell the Property by impermissibly equating his timing discretion to sell, with the right *never* to do so." The opinion concludes by explaining that the contempt was based on Paul's "violation of the Decree in not previously selling the marital home and paying her $100,000.00. Plaintiff's failure to take *any* action 'promptly' to sell the Property during the last 36 years is thus in clear contempt of a specific command by this Court." Finally, the remedy imposed by the court—awarding Geraldine lost equity in the house from the failure to promptly sell—only makes sense if the contempt finding was based on Paul's failure to sell the property.

Yet, at the same time, in the middle of its explanation for why Paul was in contempt for failing to sell the house, the circuit court also stated:

> Moreover, [Paul] was to "promptly" prepare a "time schedule" to detail the steps to effectuate such a sale. Instead, he willfully ignored this requirement altogether, claiming he complied with such requirement by providing a placeholder document containing the mere notation "to be determined." It is self-evident that stating a schedule is "to be determined" is not the provision thereof.

But the court does not base its contempt finding on Paul's failure to prepare this time schedule. Nor does the penalty imposed correspond with a failure to promptly outline the time schedule to effectuate a sale of the Catharpin properties. But Geraldine asked the circuit court to find Paul in contempt for failing to provide a schedule for the sale, and Paul assigned error to the court's

- 14 -

conclusion that he was in contempt based on violating Paragraph 35. So, for the sake of completeness, we will consider whether Paul violated an express duty contained in either part of the contract.

Starting with the circuit court's conclusion that Paul was in contempt for failing to sell the property, we cannot find a direct command in the Settlement Agreement that required Paul to sell that property *at any particular time*. Paragraph 9 states that Paul "agrees that he will sell the Catharpin property having the residence on it and that out of the proceeds of such sale, he will give [Geraldine] $100,000 in cash." But the paragraph then gives Paul "the sole discretion as to how, when and upon what terms and conditions such property is sold." This discretion would include selling the property to himself. Nothing in this paragraph expressly required Paul to sell the property by any given date. Instead, the paragraph only requires Paul to sell the property *when he decides to sell the property*. What is more, Paul's duty to sell was contingent on Geraldine signing over her interest in the property to Paul—an event which never took place.

Next, Geraldine urges us to read Paragraph 9 in conjunction with Paragraph 35, which required Paul to "promptly after execution of this Settlement Agreement . . . prepare and submit to [Geraldine] an outline and time schedule for implementation of the Settlement Agreement." We agree that a court should determine "the intent of the parties and the meaning of the language" of a contract based on "an examination of the entire instrument." *Price*, 72 Va. App. at 646. Reading the provisions together, Paul still has total discretion over the sale of the Catharpin properties. At the same time, he is supposed to promptly tell Geraldine how he is going to take care of all of his obligations under the Settlement Agreement. But his obligation to sell the properties only accrues *after* he decides to sell the properties. Even when the provisions are read together then, the agreement imposed no express duty on Paul to sell the properties by any particular time.

- 15 -

We agree with the circuit court that from the full contract, coupled with the parole evidence presented by the parties, it appears that the parties intended for Paul to sell the Catharpin properties before 36 years had passed. This conclusion is implied from the text of Paragraph 9 requiring Paul to sell and to then give Geraldine a fixed portion of the proceeds instead of a portion of the equity from such a sale. We can fairly infer that—if the parties contemplated a sale that would take place decades later—the parties would have accounted for the property's increase in value in some way. The language in Paragraph 35 requiring Paul to "promptly" provide a schedule for executing the Settlement Agreement also suggests that the parties did not intend for parts of the Agreement to be left unsettled 36 years later.

But nothing in the Settlement Agreement expressly requires Paul to have sold the Catharpin properties or to have paid Geraldine $100,000 by any date certain. Nor could Paul have sold the properties before Geraldine deeded over her interest to him. This makes the order here no different than the orders in *French*, *Shebelskie*, and *DRHI*, which clearly required that payments be made. The intent of those orders was unmistakable, but they did not expressly require payment of a specific sum by a specific date. So it was premature to find the non-payor in contempt.[11]

_____

[11] Similarly, contempt was premature in *Hanson v. Commonwealth*, where a mother waited nearly 14 months after entry of the court's order to complete the required alcohol abuse program. Slip op. at 12, 1997 Va. App. LEXIS 206, at *15. We ruled that contempt was inappropriate because the order did not specify a deadline, nor did anything suggest that time was of the essence. *Id.* Even further, in *Matrix Mechanical Corporation v. Harrison*, this Court reversed a contempt finding where the underlying agreement specified a clear timeline. Slip op. at 5-6, 1997 Va. App. LEXIS 176, at *7. Matrix had failed to deliver deeds under the agreement's provision requiring that he "execute the deeds within five days." *Id.* Although the agreement was "meaningless without delivery," we were not willing to assume, for contempt purposes, that the term "execute" required delivery of the deeds. *Id.* While these unpublished decisions have "no precedential value, [they] are nevertheless persuasive authority." *Samartino v. Fairfax Cnty. Fire and Rescue*, 64 Va. App. 499, 508 n.2 (2015).

If the court, after interpreting the Settlement Agreement, ordered payment of a specific sum by a specific date, then the failure to comply with such an express order could be later punished by contempt. *See Kernbach v. Kernbach*, No. 1070-13-4, 2014 Va. App. LEXIS 18 (Jan. 28, 2014) (affirming a contempt finding where the underlying separation agreement provided an express deadline to sell the marital residence and husband failed to do so by said date). Yet the Settlement Agreement here did not order Paul to sell the house by a certain date, or to pay Geraldine the $100,000 by a certain date. Thus, the circuit court erred by finding him in contempt.[12]

We now turn to whether Paul violated any express requirement in Paragraph 35. The relevant portion states that "[Paul] agrees promptly after execution of this Settlement Agreement to prepare and submit to [Geraldine] an outline and time schedule for implementation of the Settlement Agreement." The circuit court concluded he "willfully ignored this requirement altogether, claiming he complied with such requirement by providing a placeholder document containing the mere notation 'to be determined.' It is self-evident that stating a schedule is 'to be determined' is not the provision thereof."

Here we again find no unambiguous obligation that Paul violated. Paragraph 35 required an "outline and time schedule for implementation of the Settlement Agreement." It may be implied that this meant Paul should detail specifically when he intended to do each of the duties discussed in the preceding paragraph, but the phrase "implementation of the Settlement Agreement" is subject to interpretation. And as in *Winn*, the duty must be express, not merely implied. Furthermore, the circuit court accepted the evidence that Paul notified Geraldine that

---

[12] The circuit court explained that it had authority under Code § 20-107.3(K) to force Paul to sell the property or to appoint a commissioner to sell the property, and we agree. But, as the circuit court observed, this would only award $100,000. And the court's continuing authority to enforce the parties' intent in these ways does not transform an implication from the full agreement into an express obligation sufficient for a finding of contempt.

- 17 -

the schedule for selling the Catharpin Properties was "to be determined."[13] Given that Paragraph 9 expressly gave Paul the ability to determine when to sell the property, Paul provided at least a plausible outline and schedule for an obligation that had not yet accrued. *See Wilson v. Collins*, 27 Va. App. 411, 424-25 (1998) (reversing the trial court's finding husband in contempt for failure to give wife a copy of a life insurance policy because that duty was merely implied from the requirement that he keep a policy in effect that the wife approved of, and one could infer various other ways of complying with that requirement).

We understand the trial court's desire to compensate Geraldine for having to wait so long for the house to be sold, and that the value of $100,000 today is less than the value of $100,000 paid sometime in the past. But even if Paul never intended to sell the property and planned to instead rely on the portion of the Settlement Agreement shifting outstanding obligations and liabilities to the parties' heirs, bad faith alone is not enough for contempt absent an express order. The court's finding Paul in contempt was premature given that no court had yet expressly ordered him to sell the property by a certain date. Nor was there any court order telling him that "to be determined" was an insufficient outline and time schedule for implementing the Settlement Agreement. For these reasons, we must reverse and remand. On remand, the circuit court may exercise its authority under Code § 20-107.3(K) to order a date certain for the sale of the Catharpin Properties and/or the payment of $100,000 to Geraldine, or to issue any other order "necessary to effectuate and enforce" the marital Settlement Agreement, should the court be so advised.

---

[13] Geraldine testified that she did not remember receiving an annotated copy of the agreement and, if she had, it would have since been discarded. The circuit court accepted Paul's testimony that he provided a copy stating that the date the house would be sold on was "to be determined."

CONCLUSION

We reverse and remand the circuit court's order finding Paul in contempt of the

Settlement Agreement.

*Reversed and remanded.*